*Banegas Gomez v. Barr*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2018

(Argued: February 19, 2019          Decided: April 23, 2019)

No. 15-3269

_____

JOSE JAVIER BANEGAS GOMEZ, AKA JOSE BANEGAS

*Petitioner*,

-v.-

WILLIAM P. BARR, UNITED STATES ATTORNEY GENERAL

*Respondent.*

_____

Before:      LIVINGSTON, *Circuit Judge*, and FAILLA, *District Judge*.*

---

* Judge Katherine Polk Failla, of the United States District Court for the Southern District of New York, sitting by designation.

Judge John M. Walker, Jr., originally assigned to the panel, recused himself from consideration of this matter. The two remaining members of the panel, who are in agreement, have decided this case in accordance with Second Circuit Internal Operating Procedure E(b). *See* 28 U.S.C. § 46(d); *see also United States v. Desimone*, 140 F.3d 457, 458 (2d Cir. 1998).

Petitioner Jose Javier Banegas Gomez ("Banegas Gomez"), a native and citizen of Honduras, seeks review of a September 14, 2015 decision of the Board of Immigration Appeals ("BIA") affirming an April 9, 2015 decision of an Immigration Judge ("IJ") finding Banegas Gomez removable and denying his application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). *In re Jose Javier Banegas Gomez*, No. A 057 410 254 (B.I.A. Sept. 14, 2015), *aff'g* No. A 057 410 254 (Immig. Ct. Hartford, CT Apr. 9, 2015). We conclude that Banegas Gomez's conviction for first-degree assault under Connecticut law is an aggravated felony and that the invalidation of 18 U.S.C. § 16(b) in *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), does not necessitate a remand to the BIA for consideration of this issue. This conclusion restricts our review to only constitutional errors or errors of law, of which we see none in the agency's decision. Lastly, we reject Banegas Gomez's argument that *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), is properly read to mean that the Immigration Court that ordered his removal lacked jurisdiction because the Notice to Appear ("NTA") that was served on him failed to specify the time or date of hearing, even though a Notice of Hearing containing the requisite information subsequently issued. Accordingly, the petition for review is DENIED.

| | |
|---|---|
| FOR PETITIONER: | GLENN L. FORMICA, Elyssa N. Williams, Formica Williams, P.C., New Haven, CT, *for Petitioner*. |
| FOR RESPONDENT: | KEITH I. MCMANUS, Joseph H. Hunt, Jessica E. Burns, United States Department of Justice, Civil Division, Washington, DC, *for Respondent*. |

DEBRA ANN LIVINGSTON, *Circuit Judge*:

Petitioner Jose Javier Banegas Gomez ("Banegas Gomez"), a native and

citizen of Honduras, seeks review of a September 14, 2015 decision of the Board

of Immigration Appeals ("BIA") affirming an April 9, 2015 decision of an

2

Immigration Judge ("IJ") deeming him removable and denying his application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). *In re Jose Javier Banegas Gomez*, No. A 057 410 254 (B.I.A. Sept. 14, 2015), *aff'g* No. A 057 410 254 (Immig. Ct. Hartford, CT Apr. 9, 2015). Banegas Gomez makes three challenges to the BIA's decision: (1) that his conviction for Connecticut first-degree assault no longer constitutes an "aggravated felony" or, at the very least, a remand to the BIA is necessary to re-evaluate the issue following the Supreme Court's decision in *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), which invalidated 18 U.S.C. § 16(b) as void for vagueness; (2) that the agency erred when it denied his claim for CAT relief; and (3) that, under the reasoning of the Supreme Court in *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), the omission of information regarding the time and date of his hearing from his initial Notice to Appear ("NTA") means that jurisdiction never vested in the Immigration Court and thus that the proceedings against him must be terminated.

We conclude that no remand is necessary to determine that Banegas Gomez's conviction for Connecticut first-degree assault constitutes an "aggravated felony," as it fits within the definition of "crime of violence" in 18

3

U.S.C. § 16(a). And because Banegas Gomez's removal is predicated on commission of an aggravated felony, our jurisdiction is limited to constitutional claims and questions of law. *Ortiz-Franco v. Holder*, 782 F.3d 81, 86 (2d Cir. 2015). We see no such colorable claims in Banegas Gomez's arguments as to the agency's decision to deny him CAT relief. And lastly, we see no basis for reading *Pereira*—which dealt only with the "stop time" rule, *see* 138 S. Ct. at 2110, which is not relevant to this case—to divest an Immigration Court of jurisdiction whenever an NTA lacks information regarding a hearing's time and date. We thus join several of our sister circuits in allowing proceedings such as these to proceed.

## BACKGROUND

### I.  Factual Background[1]

Banegas Gomez was born in 1992 in Honduras. In 2004, he entered the United States as a lawful permanent resident on a petition from his stepmother, a United States citizen. Six years later, in November 2010, Banegas Gomez was arrested in Connecticut in connection with a stabbing. In May 2011, he was convicted in Connecticut Superior Court of first-degree assault with intent to

---

[1] The factual background presented here is derived from materials contained in the Certified Administrative Record ("CAR").

cause serious physical injury as well as conspiracy to commit first-degree assault. He was sentenced to twelve years in prison, "suspended after 6 years, [and] probation [for] 5 years." Certified Administrative Record ("CAR") 126.

## II. Procedural History

On May 8, 2013, Banegas Gomez was served with an NTA. The United States Department of Homeland Security ("DHS") alleged that he was removable due to his Connecticut convictions, which it deemed aggravated felonies, as defined in 8 U.S.C. § 1101(a)(43), which includes "crimes of violence" pursuant to 18 U.S.C. § 16 in its definition of such felonies. *See* 8 U.S.C. § 1001(a)(43) ("The term 'aggravated felony' means . . . a crime of violence (as defined in section 16 of Title 18, but not including a purely political offense) for which the term of imprisonment [is] at least one year . . . ." (internal footnote omitted)); *see also id.* § 1127(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable.").

Although Banegas Gomez was imprisoned at the time, he appeared before an IJ via teleconference and through his attorney he denied the charges of removability. He also submitted an application for asylum, though ultimately it was determined that he was eligible only for deferral of removal under the

5

Convention against Torture. A hearing was held on that claim in April 2015, during which both Banegas Gomez and his father testified in support of his claim. Banegas Gomez argued that he feared torture if returned to Honduras due to the murders of several of his family members, specifically two of his uncles as well as possibly an aunt. The first uncle was killed in a pool club on Christmas Eve in 2009, and while Banegas Gomez does not know the reason, he heard from others that an argument preceded the murder. Banegas Gomez's father testified that his brother was shot with no warning and did not previously know the man who shot him. Banegas Gomez's other uncle was killed in 2012, and both he and his father believe it was related to drug cartels. Banegas Gomez also testified that he feared both gang-related violence and police detention due to his tattoos—none of which are gang-related—but which might cause him to be seen as a gang member.

On April 9, 2015, the IJ issued a decision denying Banegas Gomez's CAT claim and sustaining the charges of removability against him. The IJ first determined that assault in the first degree, in violation of Section 53i-59(a)(1) of the Connecticut General Statutes, is an "aggravated felony crime of violence under 18 U.S.C. 16(b)." CAR 58. This is because "[t]here is no doubt that to

6

commit this offense . . . serious physical injury must happen to the victim." *Id.* The IJ then denied Banegas Gomez's CAT claim, concluding that despite the evidence that several of his family members were killed in Honduras there is "no evidence that the killings of his two uncles are somehow related" and that he would be endangered based on family affiliation. *Id.* at 62. As to Banegas Gomez's fear of gangs in Honduras, the IJ determined that any fear of torture is speculative and that, regardless, "there is no evidence that any torture by gangs would be with the acquiescence or willful blindness of government officials." *Id.* Lastly, the IJ rejected Banegas Gomez's claim that he might be targeted by the police for his tattoos, concluding that the police would know the difference between gang-related and non-gang-related tattoos and that there is insufficient evidence that, even if he were arrested, the treatment he would receive in a Honduran prison would amount to torture. For these reasons, the IJ ordered Banegas Gomez removed to Honduras.

Banegas Gomez appealed. On September 14, 2015, the BIA issued a decision affirming "the Immigration Judge's conclusion that the respondent did not present sufficient evidence to establish that it is 'more likely than not' the respondent would be tortured upon his removal either at the hands of the

government of Honduras, or with its acquiescence," either because of his tattoos or the deaths of his family members.   *Id.* at 3–4.

The BIA dismissed Banegas Gomez's appeal, and this petition followed. Prior to assessing his claims, we note that despite what was at the time a pending motion in this Court for a stay of removal, Immigration and Customs Enforcement ("ICE") removed Banegas Gomez to Honduras in April 2016. However, he subsequently re-entered the country illegally and is now serving a 30-month sentence ordered by a judge in the United States District Court for the Southern District of Texas for illegal re-entry in violation of 18 U.S.C. § 1326.

## DISCUSSION

## I

Banegas Gomez first argues that, following the Supreme Court's decision in *Sessions v. Dimaya*, his Connecticut convictions for first-degree assault and conspiracy to commit first-degree assault can no longer be categorized as aggravated felonies and thus he is not removable.   In the alternative, he contends that this Court should not decide the issue and should instead send his petition back to the BIA for *it* to determine whether either of his convictions can be categorized as such.   We disagree.

8

Whether a conviction is an aggravated felony is a question of law that we review *de novo*. *Pierre v. Holder*, 588 F.3d 767, 772 (2d Cir. 2009). The Immigration and Nationality Act ("INA") categorizes a "crime of violence" as an aggravated felony. 8 U.S.C. § 1101(a)(43)(F). The INA defines a "crime of violence" with reference to 18 U.S.C. § 16. *Id.* Section 16, in turn, contains two definitions of a crime of violence: "(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another," or "(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 16.

In 2018, the Supreme Court held that the second subsection, § 16(b), is impermissibly vague in violation of the Due Process Clause of the Constitution. *See Sessions v. Dimaya*, 138 S. Ct. 1204, 1223 (2018). Therefore, post-*Dimaya*, a conviction can be categorized as a crime of violence—and thus for this reason an aggravated felony—only if it falls within § 16(a)'s ambit, *i.e.*, if it can be described as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another." This subsection is often referred to as the "elements clause."

9

Banegas Gomez is correct that the agency relied solely on § 16(b) when concluding that his Connecticut conviction for first-degree assault constitutes a crime of violence. *See* CAR 58 ("[The] Court finds that DHS has clearly met its burden of proof that this is an aggravated felony crime of violence under 18 U.S.C. § 16(b)."). However, we reject Banegas Gomez's suggestion that we must remand his case to the agency for this reason. Although the agency relied on § 16(b), we conclude that Banegas Gomez's conviction for first-degree assault under Connecticut law is properly categorized as a crime of violence under § 16(a) as well. Remand is thus unnecessary.

Because we review the agency's interpretations of federal and state criminal laws—including 18 U.S.C. § 16 and Connecticut criminal law—*de novo*, *Jobson v. Ashcroft*, 326 F.3d 367, 371 (2d Cir. 2003), this is not a situation where we would benefit from the agency's reasoning on remand. *Cf. Negusie v. Holder*, 555 U.S. 511, 517 (2009); *and Rotimi v. Gonzales*, 473 F.3d 55, 58 (2d Cir. 2007). In such circumstances, nothing "'require[s] that we convert judicial review of agency action into a ping-pong game' and . . . remand is not required when it 'would be an idle and useless formality.'" *Cao He Lin v. U.S. Dep't of Justice*, 428 F.3d 391,

401 (2d Cir. 2005) (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969)).

The Connecticut first-degree assault statute has a number of subsections, but Banegas Gomez pled guilty to conduct under the first, which provides that "[a] person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument." Conn. Gen. Stat. § 53a-59(a)(1). "Serious physical injury" is defined as "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ." *Id.* § 53a-3(4). "Dangerous instrument" is defined, in relevant part, as "any instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury." *Id.* § 53a-3(7).

"In determining whether [Banegas Gomez's] conviction falls within the ambit of § 16, the statute directs our focus to the 'offense' of conviction. . . . This language requires us to look to the elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime."

11

*Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004). This method is called the "categorical approach." *See Santana v. Holder*, 714 F.3d 140, 143 (2d Cir. 2013). When a state statute, like Connecticut's for first-degree assault, contains subdivisions, we use what is called the "modified categorical approach," by which we may "ascertain the elements of the offense from such materials as the indictment, a plea agreement, or a plea colloquy"—though, again, we are not to look to the facts of the underlying conviction. *Villanueva v. United States*, 893 F.3d 123, 128 (2d Cir. 2018). "Under the plain language of § 16(a), one of the elements of a crime of violence must be 'the use, attempted use, or threatened use of physical force against the person or property of another.'" *Blake v. Gonzales*, 481 F.3d 152, 156 (2d Cir. 2007) (quoting 18 U.S.C. § 16(a)).

Although this Court has not addressed Connecticut's first-degree assault statute in the context of § 16(a), we have concluded that it is a "violent felony" for purposes of the Armed Career Criminal Act ("ACCA") and its identically worded "elements clause." *See Villanueva*, 893 F.3d at 132. In *Villanueva*, we rejected the argument that because the requisite serious physical injury under Connecticut's statute can be achieved by use of a "substance" such as poison, the statute does not require the force necessary to constitute a "violent felony." *Id.*

at 128.  We concluded that attempts such as these, to exclude from the concept of physical force actual or threatened harm inflicted by poison or other "substances," reflect an outdated conception of force.  *Id.* at 130.  As the Supreme Court stated in *United States v. Castleman*, "the knowing or intentional causation of bodily injury necessarily involves the use of physical force."  572 U.S. 157, 169 (2014).  Serious physical injury caused by a dangerous substance thus falls squarely within the definition of force "because the relevant force is the impact of the substance on the victim, *not* the impact of the user on the substance."  *Villanueva*, 893 F.3d at 129 (emphasis added); *cf. Stokeling v. United States*, 139 S. Ct. 544, 554 (2019) ("[F]orce is 'capable of causing physical injury' within the meaning of *Johnson* when it is sufficient to overcome a victim's resistance.").

Although *Castleman* was interpreting a different statute's use of "force," we have incorporated its reasoning into our analysis of various criminal statutes when employing the categorical approach.  *See, e.g., United States v. Hill*, 890 F.3d 51, 58–59 (2d Cir. 2018) (interpreting 18 U.S.C. § 924(c)(3)(B)).  Therefore, as we concluded in *Villanueva*, even if a defendant can commit first-degree assault in Connecticut by means of poison, this nonetheless encompasses the requisite

force.  *See* 893 F.3d at 129–30.   And to the extent Banegas Gomez hopes to rest his argument on our opinion in *United States v. Chrzanoski*, 327 F.3d 188 (2d Cir. 2003), it relied on "an understanding of the use of force that has been abrogated by the Supreme Court's decision in *Castleman*."   *Villanueva*, 893 F.3d at 130; *see also Hill*, 890 F.3d at 60.

Furthermore, the use of ACCA case law to interpret § 16(a), and vice versa, is widely accepted by our Court and others.  *See, e.g., Johnson v. United States*, 559 U.S. 133, 140 (2010) (observing how § 16 is "very similar" to the elements clause under § 924(e)(2)(B)(i)).   In *Villanueva* itself, this Court "accept[ed] Villanueva's premise that 'crime of violence' in subsection 16(a) is the equivalent of 'violent felony' in subsection 924(e)."   893 F.3d at 130.   We thus conclude that *Villanueva*'s determination that first-degree assault under Connecticut law has as an element the use of force under ACCA is persuasive as we determine whether this provision fits within § 16(a).   *See Stuckey v. United States*, 878 F.3d 62, 68 n.9 (2d Cir. 2017) ("[T]he identical language of the elements clauses of 18 U.S.C. § 16(a) and § 924(e)(2)(B)(i) means that cases interpreting the clause in one statute are highly persuasive in interpreting the other statute.")

Connecticut General Statute § 53a-59(a)(1) requires that a defendant cause "serious physical injury" to the victim by means of a deadly weapon or dangerous instrument. Such a crime appears on its face to involve the use of "violent" physical force, as required by *Johnson*. 559 U.S. at 140. Furthermore, *Villanueva* clarifies that just because the physical injury under Connecticut law may be caused by means of a dangerous instrument that is a substance, such as poison, this does not mean that the crime does not require the use of "physical force." *See* 893 F.3d at 128-29. Accordingly, we see no reason not to apply the reasoning of *Villanueva* and we conclude that Banegas Gomez's conviction falls squarely within the definition of a crime of violence under § 16(a).

## II

Because Banegas Gomez was ordered removed on account of an aggravated felony, our jurisdiction to review the agency's denial of CAT relief is limited to constitutional claims and questions of law. 8 U.S.C. § 1252(a)(2)(C), (D); *Ortiz-Franco*, 782 F.3d at 86. The likelihood of a future event (such as that an individual will be subject to harm) is a finding of fact, *Hui Lin Huang v. Holder*, 677 F.3d 130, 134 (2d Cir. 2012), which we generally lack jurisdiction to review in a petition from a criminal alien, *Ortiz-Franco*, 782 F.3d at 86.

To qualify for CAT relief, Banegas Gomez was required to show a likelihood of torture in his particular circumstances. 8 C.F.R. §§ 1208.16(c)(2), 1208.17(a); *Mu-Xing Wang v. Ashcroft*, 320 F.3d 130, 143–44 (2d Cir. 2003). Given the lack of evidence that individuals with non-gang-related tattoos, like Banegas Gomez, were targeted for intentional harm by gangs or Honduran authorities, or that the petitioner's family was targeted for any reason, the agency did not commit legal error in concluding that his fear of torture was too speculative to warrant relief. *See Savchuck v. Mukasey*, 518 F.3d 119, 124 (2d Cir. 2008) (upholding agency's conclusion that CAT claim resting on a chain of unsupported assumptions was too speculative to warrant relief); *Jian Xing Huang v. U.S. INS*, 421 F.3d 125, 129 (2d Cir. 2005) ("In the absence of solid support in the record . . . [an asylum applicant's] fear is speculative at best."). Banegas Gomez testified that two of his friends, who also have non-gang-related tattoos, were temporarily detained after being deported to Honduras. But the reason for their detention is unclear, and Banegas Gomez did not testify that they were tortured. The same holds true for Banegas Gomez's testimony about the killings of his uncles. Given that the evidence presented demonstrated no connection between the two killings, the agency committed no legal error in concluding that the killings were

16

not shown to be based on family affiliation and instead were "emblematic of the high level of murder in Honduras."   SPA 12.

Moreover, the agency did not commit legal error in concluding that even if Banegas Gomez were to be detained by Honduran authorities, harsh detention conditions alone would not constitute torture.  *See Pierre v. Gonzales*, 502 F.3d 109, 111 (2d Cir. 2007) (noting that to constitute torture, substandard detention conditions must be extreme and must be "inflicted by government actors (or by others with government acquiescence) *intentionally* rather than as a result of poverty, neglect, or incompetence").   Banegas Gomez's argument that prison conditions in Honduras amount to torture fails under this Court's decision in *Pierre*: he points to evidence of overcrowding and harsh conditions, Pet.'s Br. at 15–16, which the agency acknowledged, but he does not point to any evidence that these harsh conditions are intentionally imposed, rather than attributable to a lack of resources.   *See Pierre*, 502 F.3d at 111.

Finally, while legal error may occur where the agency "totally overlook[s]" or "seriously mischaracterize[s]" evidence, that was not the case here.   *Mendez v. Holder*, 566 F.3d 316, 323 (2d Cir. 2009).   The agency acknowledged the generally violent conditions in Honduras, as well as evidence of police corruption and

17

harsh prison conditions, but concluded that Banegas Gomez did not establish that he would more likely than not be tortured by the government or with government acquiescence. This factual determination is beyond the scope of our review. *Ortiz-Franco*, 782 F.3d at 91.

**III**

Banegas Gomez raises a new argument in his supplemental briefing, that his removal proceedings must be terminated because his NTA did not include the time and date for his initial hearing. He argues that this defect means that the NTA was inadequate to vest jurisdiction in the Immigration Court. Banegas Gomez relies on *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), which considered whether service of an NTA omitting reference to the time or place of the initial hearing triggers the INA's "stop time" rule for cancellation of removal. *Id.* at 2113–14; *see also* 8 U.S.C. § 1229b(d)(1). The Supreme Court held in *Pereira* that because § 1229b(d)(1)'s stop time rule explicitly provides that it is triggered by service of an NTA "under section 1229(a)," 138 S. Ct. at 2114, which itself specifies that an NTA state the time and place at which proceedings will be held, the INA unambiguously requires an NTA to include such information to trigger the stop time rule and cut off an alien's accrual of physical presence or residence

for the purposes of qualifying for cancellation. *Id*. Like several of our sister circuits, and for the reasons set out below, we conclude that *Pereira*'s self-described disposition of this "narrow question," *id.* at 2110, is not properly read to void *jurisdiction* in cases in which an NTA omits a hearing time or place. *See Karingithi v. Whitaker*, 913 F.3d 1158, 1162 (9th Cir. 2019); *Hernandez-Perez v. Whitaker*, 911 F.3d 305, 314–15 (6th Cir. 2018). Accordingly, we reject Banegas Gomez's arguments to the contrary.

Section 1229a of Title 8 provides that "[a]n immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien." And § 1229, entitled "[i]nitiation of removal proceedings," describes the written notice to be given to an alien—a "notice to appear"—as containing a variety of pieces of information, such as the "nature of the proceedings," "conduct alleged to be in violation of the law," and that the "alien may be represented by counsel." *Id.* § 1229(a)(1). It also requires that such NTAs provide "[t]he time and place at which the proceedings will be held." *Id.* "The statutory text does not, however, explain when or how jurisdiction vests with the immigration judge—or, more specifically, denote which of the several requirements for NTAs listed in § 1229(a)(1) are jurisdictional."

*Hernandez-Perez*, 911 F.3d at 313. Section 1229 in fact "says nothing about the Immigration Court's jurisdiction." *Karingithi*, 913 F.3d at 1160.

The Attorney General has promulgated regulations governing removal proceedings that *do* address when jurisdiction vests in the Immigration Court. These regulations provide that "[j]urisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by the Service." 8 C.F.R. § 1003.14(a). The regulations define a "charging document" as "the written instrument which initiates a proceeding before an Immigration Judge." *Id.* § 1003.13. The NTA is included among the enumerated examples of charging documents. Notably, the regulations require that an NTA contain the time, date, and place of a hearing only "*where practicable.*" *Id.* § 1003.18(b) (emphasis added). They direct the Immigration Court to schedule the hearing and provide notice when the NTA does not contain it in the first instance. *See id.*

Relying on *Pereira*, Banegas Gomez argues that because the NTA he received did not provide a time and date as specified in 8 U.S.C. §1229(a)(1), the NTA was "deprive[d] . . . of its essential character" and thus was not an NTA, or charging document, at all. *See Pereira*, 138 S. Ct. 2105 at 2116–17 (internal

20

citation omitted). However, Banegas Gomez's reliance on *Pereira* is misplaced. At the outset, we note the care taken by the *Pereira* Court to emphasize the narrow scope of its holding. *See, e.g., id.* at 2113. The result in *Pereira* was based on the intersection of *two* statutory provisions, one of which, addressing the stop time rule, is not relevant to Banegas Gomez's proceeding at all. Thus, the latter stop time provision—§ 1229b(d)(1)—explicitly provides that an alien's period of continuous physical presence for purposes of eligibility for cancellation is "deemed to end . . . when the alien is served a notice to appear *under section 1229(a)*." *Id.* at 2109 (emphasis added) (quoting 8 U.S.C. § 1229b(d)(1)(A)). The *Pereira* Court concluded that § 1229b(d)(1)'s reference to "under" was "the glue that bonds the stop-time rule to [§ 1229(a)'s] substantive time-and-place requirements." 138 S. Ct. at 2117. But contrary to Banegas Gomez's claim, no such statutory glue bonds the Immigration Court's jurisdiction to § 1229(a)'s requirements.

This conclusion regarding the statutory text is consistent with the regulations promulgated by the Attorney General. The agency regulations do not refer to § 1229(a)(1)'s requirements when defining what an NTA is for purposes of vesting jurisdiction in the Immigration Court. *See* 8 C.F.R.

21

§ 1003.13; *see also id.* § 1003.15. Nor do they require that an NTA contain the time, date, or place of a hearing, except "*where practicable.*" *See id.* § 1003.18(b) (emphasis added). Banegas Gomez's argument from *Pereira* that jurisdiction does not vest in the Immigration Court unless an NTA includes the time and place of hearing "would render meaningless [these regulations'] command that such information need only be included 'where practicable.'" *Karingithi*, 913 F.3d at 1160. Notably, moreover, *Pereira itself* did not question whether jurisdiction had attached in connection with the proceedings at issue there, even though had its holding applied as Banegas Gomez contends, "there also would not have been jurisdiction in *Pereira* . . . ." *Hernandez-Perez*, 911 F.3d at 314.

Our conclusion that *Pereira* is inapposite is reinforced by the BIA's precedential opinion addressing that decision. *See In re Bermudez-Cota*, 27 I. & N. Dec. 441 (B.I.A. 2018). In *Bermudez-Cota*, the BIA determined that "[t]he regulation [vesting jurisdiction] does not specify what information must be contained in a 'charging document' at the time it is filed with an Immigration Court, nor does it mandate that the document specify the time and date of the initial hearing before jurisdiction will vest." *Id.* at 445. Furthermore, the regulation listing what "must be contained in a notice to appear[] does not

mandate that the time and date of the initial hearing must be included in that document." *Id.* Instead, the BIA concluded that "a notice to appear that does not specify the time and place of an alien's initial removal hearing vests an Immigration Judge with jurisdiction over the removal proceedings . . . *so long as a notice of hearing specifying this information is later sent to the alien.*" *Id.* at 447 (emphasis added). The BIA's interpretation does not conflict with the INA and is consistent with the regulations. We agree with the BIA, moreover, that *Pereira* is not reasonably read to pronounce the broad jurisdictional rule for which Banegas Gomez contends.[2]

In this case, Banegas Gomez's May 2013 NTA did not specify the time and date of his initial hearing. However, Banegas Gomez received a hearing notice in June 2013 providing that his initial hearing would take place on August 1, 2013, at 8:30 a.m. He appeared at that hearing, as well as three subsequent

---

[2] As the Sixth Circuit recognized in *Hernandez-Perez*, "importing *Pereira*'s holding on the stop-time rule into the jurisdictional context would have unusually broad implications." 911 F.3d at 314. The Supreme Court itself noted that during the three years preceding its decision in *Pereira*, "almost 100 percent of [NTAs] omit[ted] the time and date of the proceeding." 138 S. Ct. at 2111. We do not believe the Supreme Court would have deemed its holding "narrow" if *Pereira* had the far-reaching jurisdictional consequences Banegas Gomez's reading of that decision would portend.

hearings in 2014 and 2015.   We conclude that an NTA that omits information regarding the time and date of the initial removal hearing is nevertheless adequate to vest jurisdiction in the Immigration Court, at least so long as a notice of hearing specifying this information is later sent to the alien.   The Immigration Court thus had jurisdiction when it ordered Banegas Gomez removed in April 2015.

*      *      *

Because we see no reason to vacate the agency's order of removal, we decline to address Banegas Gomez's arguments about whether, upon vacatur of his removal order, he should be able to re-enter the country as a lawful permanent resident (given his earlier removal to Honduras).

## CONCLUSION

For the foregoing reasons, Banegas Gomez's petition for review is DENIED.   As we have completed our review, the stay of removal that the Court previously granted in this petition is VACATED.