**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 16, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

NGUATEM CHARLES NKENG,

    Petitioner,

v.

WILLIAM P. BARR, United States
Attorney General,

    Respondent.

No. 18-9561
(Petition for Review)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **PHILLIPS**, and **CARSON**, Circuit Judges.
_____

Nguatem Charles Nkeng, an Anglophone (English-speaking) native and citizen

of Cameroon, petitions for review of a final order of removal. Exercising jurisdiction

under 8 U.S.C. § 1252(a), we deny the petition.

## I. BACKGROUND

Mr. Nkeng entered the United States in July 2017 without proper

documentation. The Department of Homeland Security issued him a Notice to

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. _See_ Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Appear to answer the charge that he was removable as an alien. *See* 8 U.S.C. § 1182(a)(7)(A)(i)(I). He conceded removability but applied for asylum, withholding of removal, and protection under the United Nations Convention Against Torture (CAT).

## A. *Evidence at Hearing*

At a hearing before an Immigration Judge (IJ), Mr. Nkeng testified that during college, he joined a student political party, the Yellow Party, that advocated for student rights. He took part in student strikes protesting the replacement of the school's chancellor. At one of the protests, police and gendarmes arrested some of the protestors, but not Mr. Nkeng.

After graduation in 2014, Mr. Nkeng became a part-time high school teacher and also worked in construction. In November 2016, Anglophone teachers, including Mr. Nkeng, began "sit down" strikes in the schools. Mr. Nkeng said the teachers sought greater rights for themselves and also protested the practice of giving final exams in French to Anglophones.[1] Some of the protestors were arrested, but Mr. Nkeng was not. A month later, Mr. Nkeng and other teachers took to the streets to protest, demanding the release of the arrested teachers. When the police and gendarmes arrived to disperse the strikers, Mr. Nkeng ran and escaped.

---

[1] As the IJ explained, Francophones (French-speakers) largely dominate Cameroon's government, and most Anglophone Cameroonians live in the southwest and northwest regions of the country. Mr. Nkeng is from the southwest region and speaks "Cameroonian pidgin English," which is "a creole combining elements of pidgin English and local Cameroonian languages." Admin. R. at 80 & n.2.

2

The next month, January 2017, community-wide "ghost town" protests began, during which inhabitants of Anglophone areas remained indoors on Mondays, Tuesdays, and Wednesdays. This effectively shut down commerce and government functions on those days for two months.

On February 11, 2017, National Youth Day, the governor of southwestern Buea, Mr. Nkeng's home region in Cameroon, instructed the director of the Buea Central Prison to release some prisoners to allow them to participate in a parade on behalf of the University of Buea and other schools. Most of the prisoners disappeared after their temporary release. The next day, while Mr. Nkeng was working at a construction site, police surrounded the group of construction workers, arrested them, and took them to a police station. During his arrest, Mr. Nkeng resisted and was hit with the butt of a gun on his head, waist, and hips. Mr. Nkeng testified that the governor came to the police station and said he was going to use the men to replace the prisoners who had been on temporary release for the parade and had not returned. Mr. Nkeng was then forced to sign a document stating that he had been a prisoner who had escaped.

Mr. Nkeng was held for two days in an overcrowded, windowless cell. He was not beaten. Detainees had to use a bucket as a toilet and were fed bread and water once a day. Mr. Nkeng managed to escape. While hiding at his father's house, the police came and arrested other people in the neighborhood, killing one person, but Mr. Nkeng evaded capture. Eventually, he was able to leave the country.

Mr. Nkeng testified that he feared returning to Cameroon because of the document he had signed falsely stating he was a prisoner at the Buea Central Prison who had escaped, and because there was an outstanding warrant for his arrest. He added that the fact he was an Anglophone escapee made it worse because the government "perceive[s] the anglophones as secessionists, as terrorist[s]." Admin. R. at 337.

In his closing argument, Mr. Nkeng contended that the treatment he received during his arrest amounted to persecution or torture, and that he had a fear of future persecution based on the outstanding warrant for his arrest and his protest activities as an Anglophone teacher. *Id.* at 368-72.

## B. *Immigration Judge Decision*

The IJ denied Mr. Nkeng's requests for relief and ordered him removed to Cameroon. The IJ found Mr. Nkeng's story largely credible but concluded that he failed to show that his experience in Cameroon rose to the required level of persecution under the law or that it bore a nexus to a protected ground. As for the latter, the IJ found that Mr. Nkeng's treatment during his arrest and detention was not severe enough to qualify as persecution. The IJ also found that, as Mr. Nkeng had testified, "the real basis for [his] arrest was the regional governor's desire [to] replenish the central prison after inmates escaped." *Id.* at 84. The IJ explained, "However illegitimate this was as a basis for [Mr. Nkeng's] arrest, there is no evidence that [he] was being punished for the expression of a political opinion or political opinion that was imputed to him." *Id.*

4

The IJ further found that Mr. Nkeng did not have a well-founded fear of future persecution on account of a protected ground because his alleged fear was based on his arrest and the active arrest warrant, not on a ground recognized in asylum law. The IJ therefore denied asylum and withholding of removal. The IJ also denied CAT relief, finding that Mr. Nkeng had provided insufficient evidence to show he was likely to be tortured if he returned to Cameroon.

### C. *Board of Immigration Appeals Decision*

On appeal to the Board of Immigration Appeals (BIA), Mr. Nkeng argued that his arrest and two-day detention was severe enough to constitute persecution, and that "even if [he] was only tangentially politically active," his arrest and detention "could have been based on imputed political opinion," *id.* at 21.

The BIA upheld the IJ's decision. The BIA said it had "no reason to disturb the [IJ's] finding that [Mr. Nkeng] will not, within a reasonable possibility, be 'persecuted' for political reasons in Cameroon." *Id.* at 3. It observed that Mr. Nkeng did not "meaningfully dispute the [IJ's] finding that the 'real basis for [his] arrest was the regional governor's desire to replenish the central prison after inmates escaped." *Id.* (quoting *id.* at 84).

The BIA rejected Mr. Nkeng's suggestion that "his past mistreatment could have been based on imputed political opinion," explaining that "the possibility of an alternative motivation is insufficient to establish clear error in the [IJ's] factual finding that the harm was not motivated by [Mr. Nkeng's] political opinion." *Id.* (internal quotation marks omitted). The BIA therefore concluded there was "clear

5

support for the [IJ's] factual finding that the past mistreatment [Mr. Nkeng] described . . . was not politically motivated." *Id.* at 4.

The BIA also found no clear error in the IJ's finding that Mr. Nkeng failed to demonstrate "it is more likely than not he will be tortured if removed to Cameroon." *Id.* Accordingly, the BIA dismissed Mr. Nkeng's appeal.

## II.  **DISCUSSION**

### A.  *Standard of Review*

In reviewing a BIA decision, "we decide purely legal questions *de novo*." *Ritonga v. Holder*, 633 F.3d 971, 974 (10th Cir. 2011).  We review factual findings under the deferential substantial-evidence standard.  *Id.*  Under that standard, "[o]ur duty is to guarantee that factual determinations are supported by reasonable, substantial and probative evidence considering the record as a whole."  *Sarr v. Gonzales*, 474 F.3d 783, 788 (10th Cir. 2007) (brackets and internal quotation marks omitted).  The standard is deferential in that "[a]gency findings of fact are conclusive unless the record demonstrates that any reasonable adjudicator would be compelled to conclude to the contrary."  *Id.* at 788-89 (internal quotation marks omitted).

"In this circuit, the determination whether an alien has demonstrated persecution is a question of fact[.] "  *Ritonga*, 633 F.3d at 974 (internal quotation marks omitted).  "Similarly, a request for protection under the CAT involves factual determinations reviewed for substantial evidence."  *Htun v. Lynch*, 818 F.3d 1111, 1118 (10th Cir. 2016).  "We do not weigh the evidence or evaluate the witnesses' credibility."  *Sarr*, 474 F.3d at 789 (internal quotation marks omitted).

Where, as here, the BIA issues a brief order affirming an IJ's decision, we will not affirm on grounds raised in the IJ's decision unless the BIA relied on them. *Sidabutar v. Gonzales*, 503 F.3d 1116, 1123 (10th Cir. 2007). We may therefore consult the IJ's opinion only to the extent "the BIA incorporated the IJ's reasoning, either expressly or by implication." *Sarr*, 474 F.3d at 790. Our review is confined to the reasons the agency gave, and "we will not independently search the record for alternative bases to affirm." *Ritonga*, 633 F.3d at 974.

B. *Analysis*

1. **Asylum and Withholding of Removal**

An asylum applicant has the burden of demonstrating eligibility for asylum by proving he "is a refugee[] within the meaning of [8 U.S.C. §] 1101(a)(42)(A)." 8 U.S.C. § 1158(b)(1)(B)(i). To meet that burden, the applicant must establish that he suffered past persecution or has a well-founded fear of future persecution on account of a protected ground (race, religion, nationality, membership in a particular social group, or political opinion). *See* 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 1208.13(b); *Sarr*, 474 F.3d at 788. Although persecution is not defined by statute, we have "observed that it requires the infliction of suffering in a way regarded as offensive and requires more than just restrictions or threats to life and liberty." *Xue v. Lynch*, 846 F.3d 1099, 1106 (10th Cir. 2017). A fear of future persecution is well-founded if there is a "reasonable possibility" of persecution. *Ritonga*, 933 F.3d at 976 (internal quotation marks omitted).

7

To be eligible for withholding of removal (also called restriction on removal), an alien must demonstrate that his "life or freedom would be threatened" in the proposed country of removal "because of [a protected ground]."  8 U.S.C. § 1231(b)(3)(A).  To meet this standard, an alien "must show either past persecution in the proposed country of removal, or that 'it is more likely than not that he or she would be persecuted' on one of the specified grounds upon returning to the proposed country of removal."  *Ritonga*, 633 F.3d at 978 (quoting 8 C.F.R. § 1208.16(b)(2)).

In his appellate brief, Mr. Nkeng does not directly address the evidence supporting the BIA's finding that the harm he experienced during his arrest and detention, and any fear of future persecution based on those events, is unrelated to any protected ground.  Instead, his argument centers on (1) the credibility of his testimony; (2) whether the treatment he received during his arrest and detention was severe enough to qualify as persecution; and (3) whether he has a well-founded fear of future persecution or, for withholding purposes, whether it is more likely or not his life or freedom will be threatened because of an imputed political opinion.[2]

---

[2] Mr. Nkeng also argues that he faces persecution on account of belonging to a particular social group he defines as (1) "a Cameroonian male that is believed to be an escaped prisoner and/or a Cameroonian Anglophone who was imprisoned, has escaped, and is wanted by Cameroonian authorities," Pet'r's Br. at 9; or (2) those the Cameroonian authorities view as "an Anglophone critical of the regime, an escaped political prisoner and/or he is wanted for escaping prison," *id.* at 23-24.  He claims "[h]e was a 'political' prisoner because, due to political reasons beyond [his] control, he became a political scapegoat." *Id.* at 24.  Before the agency, however, Mr. Nkeng never claimed he was a member of any particular social group.  Mr. Nkeng has therefore not exhausted this issue, which precludes us from considering it. *See Sidabutar*, 503 F.3d at 1119 (explaining that failure to present an issue to the BIA

Although the IJ deemed Mr. Nkeng generally credible,[3] his petition as to asylum and withholding of removal fails on the protected ground element. The BIA did not need to address whether the harm Mr. Nkeng experienced during his arrest and detention was severe enough to constitute persecution. This is so because it agreed with the IJ's finding that there was no nexus between Mr. Nkeng's arrest or detention and a protected ground. Substantial evidence supports this finding.

In his sworn asylum application, Mr. Nkeng stated: "The mistreatment occured [sic] because the governor of the southwest region in Buea had instructed the police officers to *randomly* arrest youths in Buea as a means to get some of the prisoners from the Buea central prison who had escaped . . . ." Admin. R. at 606 (emphasis added). At his hearing before the IJ, Mr. Nkeng reiterated that he was merely the victim of an arbitrary arrest ordered by a corrupt politician. *See id.* at 318 (testifying that the governor put him "in jail to replace the—basically to replenish the jail because the jailees had escaped"); *id.* at 319 (testifying that the governor "used us to cover up for the prisoners who escaped . . . in order to save his own job").

_____

constitutes a failure to exhaust administrative remedies, which precludes appellate review of the issue).

[3] The IJ questioned Mr. Nkeng's credibility concerning (1) part of his story of how he traveled from Cameroon to Mexico, prior to entering the United States; and (2) the truth of some information on applications for a U.S. visitor's visa he unsuccessfully submitted in 2016. The IJ found Mr. Nkeng not credible regarding painkillers and medical care a nurse allegedly provided to him while he was in hiding at his father's house after his escape from detention because "[t]his assertion was missing from [his] declaration and his father's affidavit." Admin. R. at 84 n.5.

Nothing in the record supports Mr. Nkeng's argument that he was arrested and detained on account of an imputed political opinion or other protected ground. To the contrary, substantial evidence supports the BIA's contrary determination. No reasonable fact-finder would be compelled to conclude that his arrest and detention were on account of a protected ground, or that any treatment he might receive in the future because of his arrest and detention would be based on a protected ground. Consequently, we cannot overturn the BIA's denial of asylum or withholding of removal.

## 2. CAT Relief

To obtain CAT relief, an alien must show "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). The torture would have to be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.* § 208.18(a)(1). "Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." § 208.18(a)(2).[4] Unlike

---

[4] Torture for CAT purposes is more fully defined as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or

asylum or withholding of removal, relief under the CAT "does not depend on a showing that mistreatment would be based on any particular characteristic (e.g. race or political opinion)," *Sarr*, 474 F.3d at 788. Under the substantial-evidence standard of review, we must deny the petition unless no reasonable adjudicator could reach the same finding as the IJ and BIA.

The BIA noted that "[a]part from briefly mentioning the [CAT] in his appeal brief, [Mr. Nkeng] has not alleged any error in the denial of his application for withholding of removal under the [CAT]." Admin. R. at 4. Nonetheless, the BIA saw "no clear error in the [IJ's] factual finding that [Mr. Nkeng] has not demonstrated that it is more likely than not he will be tortured if removed to Cameroon." *Id.* In a more complete explanation, the IJ said Mr. Nkeng had not proven his CAT claim because (1) despite some occurrence of torture in Cameroon by law enforcement, torture is illegal there and the government "as an entity does not practice, condone, or willfully acquiesce in torture"; (2) the record lacked evidence that Mr. Nkeng was tortured; and (3) there was "no clear probability" that the police or other Cameroonian authorities would torture Mr. Nkeng in the future. *Id.* at 85-86.

Mr. Nkeng points to evidence of his being hit with a gun while resisting arrest and then being detained for two days in overcrowded and unsanitary conditions. But this court has upheld findings that similar treatment was not persecution, which in

---

acquiescence of a public official or other person acting in an official capacity.

§ 208.18(a)(1).

11

turn is less extreme than torture. *Niang v. Gonzales*, 422 F.3d 1187, 1196 (10th Cir. 2005). For example, in *Xue v. Lynch*, we determined that no reasonable factfinder would conclude that an alien suffered persecution where he (1) "was arrested and detained in cramped, dark, and unsanitary conditions for four nights and three days"; (2) was "fed a bowl of porridge twice a day"; (3) was "interrogated once, during which time he was hit on the back of his head with an officer's hand, and then struck on his arm with an officer's baton"; (4) "did not testify that he required medical treatment, or even that he was in significant pain"; and (5) "did not claim he experienced any lasting problems as a result of his detention." 846 F.3d at 1107. We further observed that this court had "determined that similar fact situations did not compel a finding of past persecution." *Id.* (citing *Witjaksono v. Holder*, 573 F.3d 968, 977 (10th Cir. 2009), and *Kapcia v. INS*, 944 F.2d 702, 704, 708 (10th Cir. 1991)).[5]

Mr. Nkeng's mistreatment during his arrest and detention is not materially distinguishable. He was (1) hit while resisting arrest, (2) detained for two days in cramped and unsanitary conditions with limited nutrition, (3) did not credibly testify

---

[5] As summarized in *Xue*, this court affirmed the finding in *Witjaksono* "that an alien had not suffered past persecution when evidence showed [a] soldier physically assaulted [an] alien on one occasion and [the] alien suffered minor injuries that did not require medical treatment." *Xue*, 846 F.3d at 1107. And in *Kapcia*, we affirmed a "finding that aliens suffered no past persecution when evidence showed one alien was arrested four times, detained three times, and beaten once and the other alien was twice detained for forty-eight hours during which time he was interrogated and beaten." *Id.*

that any injuries he sustained required medical treatment,[6] and (4) did not testify that his mistreatment caused him any lasting problems. Applying our precedent and substantial evidence standard of review to the record, we cannot say that "any reasonable adjudicator would be compelled to conclude" that the IJ's finding on the likelihood of torture was wrong. *Sarr v. Gonzales*, 474 F.3d at 788-89.

Mr. Nkeng's remaining arguments are unavailing. He recites documentary evidence in the record stating there have been "several reports that members of defense and security forces committed arbitrary and unlawful killings," and that prison conditions are generally deplorable. Pet'r's Br. at 17-19. But this evidence fails to show that it is more likely than not Mr. Nkeng would be killed or tortured if he returned to Cameroon.

Even if Mr. Nkeng might be arrested on his outstanding warrant and imprisoned, the evidence of poor prison conditions is also insufficient to meet Mr. Nkeng's burden because it does not show the government imposes the conditions for the purpose of torture. *See* 8 C.F.R. § 208.18(a)(5) ("In order to constitute torture, an act must be *specifically intended* to inflict severe physical or mental pain or suffering. An act that results in unanticipated or unintended severity of pain and suffering is not torture." (emphasis added)); *Banegas Gomez v. Barr*, 922 F.3d 101, 109-10 (2d Cir. 2019) (noting that for prison conditions to constitute torture, they must be "extreme" and, like torture itself under § 208.18(a)(5), imposed

---

[6] As noted in footnote 3, *supra*, the IJ did not credit Mr. Nkeng's testimony that the beating he sustained required painkillers or a nurse's care.

13

"*intentionally* rather than as a result of poverty, neglect, or incompetence" (internal quotation marks omitted)).

Mr. Nkeng points to additional parts of the record that, he says, support his CAT claim. They largely consist of a United States State Department Human Rights Report for 2016, nongovernmental organization reports, and news articles. The documents refer to episodes of torture, describe human-rights abuses, and detail the ongoing conflict between the Francophone government and the Anglophone minority, many of whom have fled the country to avoid violent government crackdowns. An IJ must consider "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal" when assessing a claim for CAT relief. 8 C.F.R. § 1208.16(c)(3)(iii). But Mr. Nkeng has not explained how the record evidence of *general* conditions shows *he* is more likely than not to be tortured if he is removed to Cameroon.[7]

---

[7] *See Dhital v. Mukasey*, 532 F.3d 1044, 1051-52 (9th Cir. 2008) (per curiam) (upholding denial of CAT relief where evidence of an ongoing internal political struggle in Nepal, including torture, did not indicate that the alien "would face any particular threat of torture beyond that which all citizens of Nepal are at risk"); *Almuhtaseb v. Gonzales*, 453 F.3d 743, 751 (6th Cir. 2006) (explaining that to qualify for CAT relief, an alien "must establish a particularized threat of torture," and concluding that general statements regarding torture in alien's home country did not show it was "more likely than not that [the alien] herself would be subject to such treatment" (internal quotation marks omitted)).

### III. **CONCLUSION**

We uphold the BIA's affirmance of the IJ's decision under the substantial evidence standard.  The petition for review is denied.

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge