*Martinez Roman v. Garland*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2021

(Argued: January 14, 2022    Decided: September 15, 2022)

Docket No. 20-3476

MARCO ANTONIO MARTINEZ ROMAN,

*Petitioner*,

—v.—

MERRICK B. GARLAND, UNITED STATES ATTORNEY GENERAL,

*Respondent.*

B e f o r e :

POOLER, CHIN, and CARNEY, *Circuit Judges.*

Petitioner Marco Antonio Martinez Roman, a native and citizen of Mexico, seeks review of a Board of Immigration Appeals decision affirming an Immigration Judge's denial of Martinez's application for cancellation of removal. *In re Marco Antonio Martinez Roman*, No. A201-347-082 (B.I.A. Sept. 30, 2020), *aff'g* No. A201-347-082 (Immig. Ct. N.Y. City Apr. 13, 2020). Martinez's cancellation application rested on his assertion that his removal would cause exceptional and extremely unusual hardship to his three young, U.S.-citizen children, whose mother, Martinez testified, was unable to care for them. Martinez sought a brief continuance of his merits hearing to enable him to

present live testimony from an expert and others with first-hand knowledge regarding his children's health, the family's circumstances, and the nature and severity of the hardship that his removal would cause. The IJ denied a continuance and then found Martinez ineligible for cancellation on the ground that he failed to establish the necessary hardship. The Board of Immigration Appeals affirmed. On review, we conclude that the agency abused its discretion in denying Martinez the requested continuance because the denial prevented him from presenting relevant and material testimony in support of his application and there was no finding that adjournment would be unreasonable, onerous, or prejudicial. We therefore grant his petition and remand the case for further proceedings.

PETITION GRANTED.

―――――――

ZOE LEVINE (Ryan Brewer, *on the brief*), *for* The Bronx Defenders, Bronx, NY, *for Petitioner*.

SHEREASE PRATT, Senior Litigation Counsel, (Brian M. Boynton, Acting Assistant Attorney General, Civil Division; Jonathan Robbins, Senior Litigation Counsel, *on the brief*), United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington, DC, *for Respondent*.

John Harland Giammatteo, Lutheran Social Services of New York Immigration Legal Program, New York, NY, *for* Amici Curiae *Former Immigration Judges and Members of the Board of Immigration Appeals*.

―――――――

CARNEY, *Circuit Judge*:

Petitioner Marco Antonio Martinez Roman ("Martinez"), a native and citizen of Mexico, seeks review of a Board of Immigration Appeals ("BIA") decision affirming the decision of an Immigration Judge ("IJ") denying Martinez's application for cancellation of removal. *In re Marco Antonio Martinez Roman*, No. A201-347-082 (B.I.A. Sept. 30, 2020), *aff'g* No. A201-347-082 (Immig. Ct. N.Y. City Apr. 13, 2020). Martinez's application

rested on his assertion that removing him from the United States would cause "exceptional and extremely unusual hardship" to his three young, U.S.-citizen children, whose mother, Martinez testified, was unable to care for them. 8 U.S.C. § 1229b(b)(1)(D). Martinez sought a brief continuance of the merits proceeding to enable him to present live testimony from an expert and three others regarding his children's health, the family's circumstances, and the nature and severity of the hardship that his removal would cause. The IJ denied the requested continuance as well as an alternative request to permit the expert to testify by telephone and then found Martinez ineligible for cancellation on the ground that he failed to establish the necessary hardship. The Board of Immigration Appeals affirmed.

On review, we conclude that the agency abused its discretion in denying the brief continuance that Martinez sought. The IJ's denial fell outside the range of permissible decisions because it prevented Martinez from presenting relevant and material testimony in support of his application with regard to the precise ground on which the BIA ruling turned. We therefore GRANT his petition and REMAND the case to the agency for further proceedings consistent with this opinion.

## BACKGROUND[1]

On September 23, 2019, the Department of Homeland Security ("DHS") initiated removal proceedings against Martinez, who had entered the United States without inspection. DHS served him with a Notice to Appear ("NTA") that charged him with removability under section 212(a)(6)(A)(i) of the Immigration and Nationality Act. 8 U.S.C. § 1182(a)(6)(A)(i). That section provides that a noncitizen "present in the United States without being admitted or paroled, or who arrives in the United States at any

---

[1] We draw this factual statement from the Certified Administrative Record ("CAR"), noting any relevant disputes.

time or place other than as designated by the Attorney General, is inadmissible." *Id.* The NTA did not include the date or time of Martinez's removal hearing. Immigration and Customs Enforcement ("ICE") immediately took Martinez into custody and he remains detained.

On January 16, 2020, about four months after he was placed in ICE custody, Martinez applied for cancellation of removal under 8 U.S.C. § 1229b(b), contending that he satisfies the several conditions for relief that are imposed by the statute.[2] The condition at issue here is that removal would cause "exceptional and extremely unusual hardship" to qualifying U.S.-citizen relatives. 8 U.S.C. § 1229b(b)(1)(D). Martinez asserted then, as he does now, that his removal would cause such extreme hardship to his three children: Emely, then age 13; Jaden, then age 8; and Jaliyah, then age 6.

## I.  Martinez's February 14 Request for a Continuance

On January 16, 2020, the day that Martinez applied for cancellation, IJ Lisa Ling scheduled Martinez's individual merits hearing for March 9, 2020. On February 14, Martinez moved for a continuance, explaining that he had not yet been able to identify a psychologist who could complete an evaluation of his children and prepare an appropriate written report before the call-up date of March 4,[3] and who was also

---

[2] Section 1229b(b)(1) authorizes the Attorney General to cancel removal and adjust the status of a noncitizen who is a nonpermanent resident and who: (1) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of the application; (2) has been a person of good moral character during such period; (3) has not been convicted of certain serious offenses; and (4) establishes that removal would result in "exceptional and extremely unusual hardship" to a U.S. citizen or lawful permanent resident spouse, parent, or child. 8 U.S.C. § 1229b(b)(1).

[3] A call-up date is the deadline set by the IJ for the applicant to file all documents in connection with the application for relief. *See* CAR at 248; *see also El-Gazawy v. Holder*, 690 F.3d 852, 854 (7th Cir. 2012).

4

available to testify at the merits hearing scheduled for March 9. In his motion, Martinez advised that Dr. Joseph Giardino, a psychologist whom he had asked to evaluate his children, was prepared to do so but was unavailable to testify in person or by telephone on March 9. Martinez's counsel advised that she reached out to two additional psychologists to inquire if either could perform the evaluations and testify on March 9, but she did not receive confirmation.[4] Because Dr. Giardino was unable to appear at his hearing, Martinez requested "a continuance of two weeks or more in order to be able to fully present [Martinez's] case" and to "avoid further unnecessary delay." CAR at 652. In the alternative, Martinez asked for "a proactive adjournment of the hearing on March 9, 2020 for another date two weeks or . . . later, in order to present [medical evidence], and in order to have a full and fair opportunity [to] be heard on the merits of his application." *Id.*

On February 18, IJ Lauren Farber denied Martinez's motion. She ruled, however, that the denial was without prejudice, expressly leaving Martinez free to "renew the request at the conclusion of [his] and any fact witness'[s] testimony." *Id.* at 648.[5]

---

[4] According to the motion, Martinez's counsel "reached out" to Dr. Giardino on February 6, 2020, one full month before the hearing, to ask whether he would perform a psychological evaluation and testify at the hearing. CAR at 651. Dr. Giardino advised that he was available to assist, but three days later informed counsel that he was unavailable to testify on March 9. On February 13, Martinez's counsel reached out to two other psychologists, Dr. Maria Lariño and Dr. Andrew Rasmussen, to inquire about their availability to evaluate Martinez's three children and testify at the hearing. Martinez's counsel reported that Dr. Lariño indicated that she was unable to complete the evaluations before March 9. Counsel had not heard back from Dr. Rasmussen when she filed Martinez's motion to continue.

[5] Several other brief continuances had been entered between mid-October 2019 and Martinez's January 2020 application for cancellation of renewal. But the government opposed none of them and none reflected dilatory tactics, so far as the record before us reflects. Two continuances in October 2019 were required in part by the failure of the Orange County Jail video feed, preventing counsel from speaking with Martinez. Martinez's counsel sought a further continuance of "one-to-two additional weeks" to allow time to prepare and file the motion to

On March 4, five days before the scheduled hearing, Martinez sought leave to have Dr. Giardino—who had by then completed his assessment of Martinez's children—testify by telephone. Martinez advised the agency that Dr. Giardino had recently evaluated the children and concluded (in Dr. Giardino's words) that they each "experienced a severe decline in their mental health" in Martinez's absence. *Id.* at 357. Martinez's counsel represented to the IJ that Dr. Giardino's busy patient schedule did not allow the doctor to testify in person on March 9 but that he could testify telephonically that day about his observations and expert opinions.

No action was taken on the March 4 request until the hearing was convened.

## II. The March 9 Hearing

Martinez's individual hearing was convened on March 9 before IJ Charles Conroy, one of the four IJs assigned to Martinez's case over the course of the proceedings.[6] In anticipation of the hearing, Martinez's counsel had submitted to the IJ and to the government a copy of Dr. Giardino's twelve-page long affidavit summarizing his evaluation of the children. The hearing began with IJ Conroy announcing that he denied Martinez's motion to allow Dr. Giardino to testify telephonically, explaining that he did so because Martinez presented "no evidence to

terminate removal proceedings and the application for cancellation of removal, and the IJ ultimately entered a longer continuance because there were "already too many cases on [the] docket for" the existing hearing date. CAR at 756, 758. At the rescheduled hearing, the IJ *sua sponte* announced a final continuance to allow the government time to reply to Martinez's request for reconsideration of his motion to terminate. Martinez was incarcerated throughout these proceedings.

[6] Martinez first appeared before IJ Margaret Kolbe on October 17, 2019. IJ Conroy denied Martinez's motion to terminate proceedings, and IJ Lauren Farber denied Martinez's motion for consideration. On January 16, 2020, Martinez submitted his cancellation application to IJ Lisa Ling, who scheduled Martinez's merits hearing for March 9. On February 16, Martinez filed his motion to continue, and IJ Farber denied the motion without prejudice. Finally, on March 9, Martinez appeared for his individual merits hearing before IJ Conroy.

support [Dr. Giardino's] inability to appear" in person. *Id.* at 254. Martinez's counsel pointed out that her motion seeking a continuance advised that Dr. Giardino's prior patient commitments prevented him from traveling to appear in person at the hearing on March 9. The IJ then remarked that Dr. Giardino's live testimony, whether telephonic or in person, was unnecessary in any event because Martinez's counsel had filed Dr. Giardino's written report and the government had expressed a willingness to stipulate to the report's findings. He explained, "[Y]ou have a detailed affidavit from [Dr. Giardino] that I can review and that I assume would cover all the issues." *Id.* at 256. He informed the parties that he would give the written report "full weight as if [Dr. Giardino] had testified consistent with it on direct examination." *Id.* When Martinez's counsel began to explain that Dr. Giardino could also offer relevant testimony that was *not* set forth in his twelve-page written report, both expanding on and explaining what he had written, the IJ ended the colloquy, repeating that Dr. Giardino's testimony would only "regurgitate" his written report and so would not be of use.[7] *Id.* at 257.

---

[7] The colloquy was reported as follows:

> **Counsel**: Your Honor, I would like to present [Dr. Giardino] as a witness . . . . I believe there may be some things that he would testify about that . . .
>
> **IJ**: Okay. Well, here's what I'm going to do counsel. Look, the Government's going to stipulate, all right? . . . I don't see why I would continue the case when the Government's going to stipulate we have a detailed evaluation from [Dr. Giardino] . . . . So unless something pops up that's unusual, I'm going to accept the stipulation . . . .
>
> **Counsel**: Just for the record, I would like to put my witness on . . . .
>
> **IJ**: Okay. And I understand you want to put the witness on but . . . there's really no need . . . for the witness to regurgitate what's in here.

CAR at 256–57.

After the IJ refused to allow Dr. Giardino to testify by telephone, Martinez's counsel orally renewed her motion for a continuance, citing—in addition to Dr. Giardino's unavailability to appear in person and the denial of his request for a telephonic appearance —the unavailability that day of three fact witnesses whom counsel planned to call to testify about the hardship that Martinez's removal would cause for his young children.[8] Counsel advised that, first, Martinez's close family friend Stephanie Nava Ramirez was prepared to testify about the incapacity of the children's mother and to describe Martinez's role as the primary caregiver for the three children. Second, Martinez's 13-year-old daughter, Emely, would testify as to the hardship that she and her younger siblings had experienced since their father's arrest. Third, Martinez's sister-in-law, Yamilet Silva Cadena, would testify that the children's mother, Yazmin Ochoa Cadena ("Ochoa"), is not able—either financially or emotionally—to care for them in their father's absence. Martinez's counsel explained that Nava Ramirez was unavailable to testify on March 9 because her own child with special needs had a conflicting appointment that day with a specialist, and that Emely and Silva Cadena planned to rely on Nava Ramirez for transportation to the proceedings and therefore were likewise unable to attend the hearing.

After conferring with the parties, the IJ denied the motion, explaining that he preferred to review and rely on the witnesses' written statements, which the IJ characterized as "very detailed":

> **IJ**: You have detailed statements from the lay witnesses, counsel, is there any reason we need to continue further testimony?

---

[8] Although Martinez did not list these three fact witnesses in his February 16 motion to continue, he did list them on his March 4 witness list. Both the IJ and the government thus had notice of Martinez's desire to have them testify in support of his application.

8

**Counsel**: Yes, Your Honor, I would like to present . . . witnesses. [If] Your Honor would not want to hear them, that's up to Your Honor but –

**IJ**: It's not that I don't want to hear them.

**Counsel**: Yes.

**IJ**: It's that I'm hearing them when I look at these very detailed statements. Okay?

*Id.* at 261.

The hearing then proceeded.

Martinez appeared by video teleconference from the Orange County Jail, where he was being held by ICE. He testified that he was raised in Atelandio Solio, Puebla, Mexico, where he lived until he was 18 years of age. He stated that he was sexually abused as a young child, an experience that left him traumatized and depressed and made him "very protective" of his own children. *Id.* at 276. He told the IJ about the deterioration of his children's physical and mental health that had occurred since his detention began. He explained that in his absence, Emely, Jaden, and Jaliyah had moved to live in a cramped two-bedroom apartment shared by ten family members (including their mother, Ochoa).[9] He described how Emely, then age 13, was at risk of falling behind in school because "she is struggling with depression." *Id.* at 279. He described the oral pain that she suffered from her "deformed" braces, which the family lacked the funds or insurance to repair, especially in Martinez's absence. *Id.* at 280.

His 8-year-old son, Jaden, was then doing "very, very poorly" because he too suffered from depression and received "bad reports from school." *Id.* at 281. Martinez recounted that his 6-year-old daughter, Jaliyah, had "suffered a lot" without him and

---

[9] Martinez testified that, before he was detained, Jaden and Jaliyah lived with him because Ochoa "did not want to take them with her" when the two ended their relationship. CAR at 282. Emely lived with her mother until Martinez's arrest.

that she "can't be alone . . . she hides to cry . . . . [and] looks for me." *Id.* Finally, Martinez testified that Ochoa, the children's mother, "doesn't have the capacity or the patience to take care of [the children]," did not have health insurance, and could not "economically support the three children." *Id.* Martinez expanded on each of these themes in his direct testimony.

At the hearing, the IJ also questioned Martinez. He asked, among other things, where Martinez's children would reside if he were removed. Martinez stated that his children "would stay here in the United States" because "it's their country and it's very dangerous" in Mexico. *Id.* at 288. The IJ also asked about Martinez's employment history in Mexico as well as his criminal record, drug use, and whether he paid taxes while residing in the United States.

Near the conclusion of the hearing, Martinez's counsel requested additional time to ask Martinez how his removal would affect his children's behavior, to which the IJ responded, "I'll allow a couple questions on that. I'm not going to go another 10 minutes on that." *Id.* at 320. Martinez's counsel asked several follow-up questions before the IJ ended questioning.[10] The government did not request any additional cross-examination and the hearing concluded.[11]

---

[10] Shortly after Martinez's counsel resumed questioning him after her request, the IJ stated, "All right counsel. Do you have one more question? One more question. I think, you know, the effect on the children's pretty well covered, especially with the psychological evaluation so —." CAR at 321.

[11] As Martinez highlights, the IJ insisted on completing Martinez's merits hearing within an hour, despite Martinez's counsel's request for 50 percent more:

**IJ**: Okay. All right, counsel, what are we looking at for direct examination, how much time?

**Counsel**: Your Honor . . . I would say at least and [sic] hour and a half . . . .

Dr. Giardino's written report was entered into the record. In it, Dr. Giardino described Emely as "clearly in a vulnerable state," "suffering from severe symptoms of depression," and "meet[ing] full diagnostic criteria for Major Depressive Disorder." *Id.* at 349. Dr. Giardino reported that Jaden "presented with severe anxiety symptoms, hyperactivity, and attention problems" and "currently meets full diagnostic criteria for Separation Anxiety Disorder . . . and Attention-Deficit/Hyperactivity Disorder." *Id.* at 351. Jaliyah, too, "presented with severe anxiety symptoms and met full diagnostic criteria for Separation Anxiety Disorder." *Id.* at 354. Dr. Giardino wrote in summary that Martinez's children "depend immensely on their father for emotional and economic support." *Id.* at 357.

He identified what he saw as the available treatment options for the three children—again, ages 13, 8, and 6—if their father were removed. These included measures such as "keep[ing] a journal," "weekly [counseling] sessions," and "deep breathing exercises." *Id.* at 350, 355. Dr. Giardino's "strongest recommendation," however, was "that [Martinez] be permitted to remain in the United States . . . to continue to provide this crucial support to his three children." *Id.* at 357.

---

**IJ**: That's – let's shoot for an hour. I think that's plenty of time to establish the record, then we'll see where we are at that point.

**Counsel**: Respectfully, Your Honor, [Martinez] has a right to a full . . . hearing --

**IJ**: Yes, he does and I have a right to regulate the conduct of these proceedings if I think there's sufficient testimony after an hour, that'll be it. If not, we can continue. Please start.

CAR at 272.

11

### III. The IJ's Decision

On April 13, IJ Conroy issued his written decision. The IJ found that Martinez testified credibly at the merits hearing but ruled that he was ineligible based on his failure to satisfy two of the four applicable statutory conditions. *See* n.2, *supra*. First, in light of his past failure to pay taxes and his prior arrests, he did not establish the good moral character necessary to qualify for cancellation.[12] Second, Martinez failed to provide sufficient evidence that his removal would cause the requisite "exceptional and extremely unusual hardship" to his three children. Special Appendix ("SA") at 22.

As to the latter, the IJ acknowledged that all three of Martinez's children suffer from "symptoms and impairments related to their current and/or possible future separation from [Martinez]," including "a severe decline in their mental health." *Id.*[13] Accepting Dr. Giardino's report, the IJ further determined that "Emely meets the full diagnostic criteria for 'Major Depressive Disorder, Severe, Single Episode' [], Jaden meets the full diagnostic criteria for 'Separation Anxiety Disorder' [] and 'Attention Deficit/Hyperactivity Disorder, Combined Presentation,'[] and Jaliyah, who presented with severe anxiety symptoms, met the full diagnostic criteria for [Separation Anxiety Disorder]." *Id.* The IJ also acknowledged the children's medical conditions requiring

---

[12] Martinez testified that he paid taxes in the United States "once," about eight years earlier. CAR at 292. Martinez also advised that he was paid in cash, "off the books" for years, and did not know whether or not he owed taxes to the U.S. government. *Id.* at 295. Further, Martinez was convicted of grand larceny in 1999, driving while impaired by alcohol in 2006, and criminal possession of a controlled substance in 2007 and 2008. In 2019, he was found guilty of aggravated driving while impaired with a child passenger.

[13] In addition, the IJ recognized, "Emely is 'at risk for long-term personality disturbance in adulthood,' . . . Jaden 'is at risk for the development of more severe behavioral problems in school,' and . . . 'Jaliyah is at risk for the development of a mood disorder.'" SA at 22 (quoting CAR at 357, Psychological Evaluation by Dr. Giardino).

attention, namely, that "Emely has dental needs and has not been able to get her braces fixed," and Jaden "suffers from a 'perforated tympanic membrane' of the left ear." *Id.*

The IJ commented that he "sympathizes with the children's mental health diagnoses and related symptoms"; nonetheless, he found, Martinez did not "sufficiently show that their quality of life would be negatively affected as a result of [his] removal in a way that would rise to the level of exceptional and extremely unusual hardship." *Id.* Pointing to the psychological evaluation by Dr. Giardino, the IJ ruled that "[t]he record . . . does not suggest, much less establish, that the children would be *wholly* unable to access or receive the mental health services/treatments recommended by Dr. Giardino should [Martinez] be removed to Mexico." *Id.* at 23 (emphasis supplied). The IJ recognized that Martinez was the sole financial provider for the three children but concluded further that the record did not establish that family or community members, such as Silva Cadena, who also resides at the two-bedroom apartment, or Nava Ramirez, who visits the children "once every two weeks or so," would be sufficiently unable to support his children in his absence. *Id.* at 24. In the IJ's view, "[e]ven accounting for the financial difficulties [Ochoa] has experienced, or may experience should [Martinez] be removed to Mexico, the record does not sufficiently show that other family and/or community members cannot, or would not be able to, provide support for the children or [their mother] should they require it." *Id.*[14]

The IJ then denied Martinez's application for cancellation of removal and ordered his removal to Mexico.

---

[14] The IJ also rejected Martinez's argument that the agency lacked jurisdiction over his removal proceedings because of deficiencies in the NTA, determining that the court's jurisdiction was unimpaired because "the NTA was perfected by the issuance of a subsequent Notice of Hearing [that provided] the missing information." SA at 6 n.2. As described *infra*, we agree, and we deny Martinez's petition insofar as it presses the jurisdictional argument.

**IV.    The BIA's Decision**

Martinez sought review by the BIA, arguing, among other grounds for reversal, that the IJ erred by denying him a continuance that would have allowed Dr. Giardino and his three fact witnesses to testify. The BIA affirmed the IJ's decision and order of removal, endorsing the IJ's view that Martinez did not establish exceptional or extremely unusual hardship to a qualifying relative. It did not address any other statutory ground for denying cancellation.

In its analysis of the merits of the IJ's decision, the BIA first found no clear error with respect to the IJ's finding that Martinez's "children's medical conditions are not so serious in nature to rise to the level of exceptional and extremely unusual hardship." SA at 2. It agreed with the IJ's conclusion that "the children can address their mental health diagnoses with psychological treatment and daily habits, which were recommended by the children's psychologist, especially considering that the children will remain in the United States where this care is available to them." *Id.* In addition, it concurred that Emely's painful braces "can be addressed with treatment that, although it may not be immediately financially available to them, may eventually be pursued," and Jaden's "perforate[d] tympanic membrane does not necessitate any medical care at this time." *Id.* Addressing the family's financial difficulties, the BIA determined in line with the IJ's similar findings that Martinez "did not meet his burden, through documentary or country conditions evidence, to show that he will be unable to find work in Mexico in order to continue to provide some financial support [to] his family." *Id.*

Turning to the children's living situation should Martinez be removed, the BIA also found no clear error in the IJ's finding that "the children will have familial and financial support in the United States," although it acknowledged at the same time that "[t]he entire family, ten people in total, currently reside in a two-bedroom apartment." *Id.* In particular, the BIA adopted the assessment that "the children's mother is currently

14

a present part of their lives, and will likely continue to be a constant parental figure." *Id.* It dismissed Martinez's plea for an opportunity to provide additional live testimony on the adversity his children would face in his absence—for example, on the incapacity of their mother and their emotional vulnerability—and proceeded to rule on the record as it stood that Martinez "ha[d] not established that a qualifying relative would suffer hardship that is substantially different from, or beyond, that which would normally be expected from the removal of a parent from the United States." *Id.* at 3.[15] With respect to Martinez's challenge to the IJ's denial of a continuance, the BIA determined that Martinez "has not otherwise identified any additional information his four witnesses would have provided [that] would have affected the outcome of this case." *Id.* at 4.

Martinez timely petitioned for review. In this Court, he argues that the IJ erred by ruling on the merits of his exceptional and extremely unusual hardship claim without allowing a continuance such that his four proffered witnesses could testify in person.[16] Because we conclude that the agency abused its discretion by denying

---

[15] The BIA did not address the IJ's treatment of other conditions for obtaining cancellation of removal; for example, the moral character determination or the question whether Martinez adequately corroborated his request for relief. The BIA also rejected two additional arguments that Martinez made before the BIA. In its decision, the BIA identified "no judicial misconduct or prejudice toward [Martinez] that would call into question the fundamental fairness of his proceedings." SA at 4. The BIA also concluded that Martinez had not specifically alleged how he "was prejudiced in such a way that but for the [IJ's] behavior and alleged due process violations, there would have been a different outcome." *Id.* at 5.

[16] Martinez also presses his jurisdictional argument, described above, *see* n.14, *supra*, regarding the effect of his deficient NTA. Intervening case law establishes, however, that the IJ had jurisdiction over Martinez's removal proceedings. In *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), the Supreme Court held that an NTA must include a removal hearing time and place to trigger the "stop-time rule," which cuts off a noncitizen's accrual of continuous physical presence for purposes of cancellation of removal. *See id.* at 2110. Less than a year later, we ruled that *Pereira*'s holding is limited to the stop-time rule and does not "void *jurisdiction* in cases in which an NTA omits a hearing time or place." *Banegas Gomez v. Barr*, 922 F.3d 101, 110 (2d Cir. 2019) (emphasis in original). Two years later, the Supreme Court held in *Niz-Chavez v. Garland*, 141 S. Ct. 1474

15

Martinez's request for a continuance to present this directly relevant and material testimony, we grant his petition and remand the case for further proceedings.

## DISCUSSION

An IJ may grant a motion for continuance "for good cause shown." 8 C.F.R. § 1003.29. We review the BIA's decision affirming an IJ's refusal to grant a continuance for abuse of discretion. *See Sanusi v. Gonzales*, 445 F.3d 193, 199 (2d Cir. 2006).

Martinez invites us to rule that, by refusing to allow his expert and three fact-witnesses to testify in person, the IJ violated Martinez's constitutional due process, statutory, and regulatory rights to present material and relevant testimony. *See Lopez-Umanzor v. Gonzales*, 405 F.3d 1049, 1056 (9th Cir. 2005) ("Due process principles prohibit an IJ from declining to hear relevant testimony because of a prejudgment about . . . 'the probative value of [the] testimony.'" (quoting *Kaur v. Ashcroft*, 388 F.3d 734, 737 (9th Cir. 2004))). We need not go so far, however, to conclude that a remand is required.[17]

---

(2021), on which Martinez relies, that for stop-time rule purposes a notice that subsequently provides the time and place of a removal hearing does not cure an NTA that is defective under *Pereira* because the applicable statutory provisions require the time and place to appear to be set forth in a "single document." 141 S. Ct. at 1480. Last year, however, we ruled that "*Banegas Gomez* remains good law even after . . . *Niz-Chavez*" because "*Niz-Chavez* did not question whether jurisdiction had attached, even though the petitioner had not received a single notice containing the [removal] hearing time and place." *Chery v. Garland*, 16 F.4th 980, 987 (2d Cir. 2021). Although Martinez's September 2019 NTA did not specify the time and date of his initial hearing, he subsequently received hearing notices providing that information, and he attended his hearing on the date and at the place specified. Thus, Martinez's jurisdictional challenge is now foreclosed.

[17] On appeal, Martinez also argues that remand is necessary because the IJ misapplied the legal standard for cancellation of removal and mischaracterized relevant evidence. For the reasons discussed below, we need not reach these arguments because we conclude that remand is required for the IJ to consider Martinez's witnesses' live testimony in order to have a more complete record before ruling on the merits of Martinez's application.

Ordinarily, "IJs are accorded wide latitude in calendar management," and such decisions are reviewed "under a highly deferential standard of abuse of discretion." *Morgan v. Gonzales*, 445 F.3d 549, 551 (2d Cir. 2006). Under this standard, "[a]n IJ would [] abuse his discretion in denying a continuance if (1) [his] decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding or (2) [his] decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Rajah v. Mukasey*, 544 F.3d 449, 453 (2d Cir. 2008) (quoting *Morgan*, 445 F.3d at 551–52).

Here, the IJ rested his denial of the continuance on an assumption that witness testimony would be unnecessary and then faulted Martinez for perceived gaps in the record that those witnesses likely would have been able to fill. In the circumstances presented, we conclude that Martinez has demonstrated that the IJ's decision fell outside the range of permissible decisions, as did the BIA's decision endorsing that decision. Accordingly, the petition must be granted.

Despite Martinez's multiple, well-reasoned attempts to obtain a brief continuance that would allow him to provide live testimony directly related to one of the ultimate issues in his application—whether his children would suffer exceptional and extremely unusual hardship as a result of his removal—the IJ chose to rely on written statements of those witnesses alone, written statements that the IJ appears to have not fully read when he denied the requested continuance. Among those statements that the IJ considered "very detailed" was a one-page handwritten note from thirteen-year-old Emely. CAR at 261. She wrote that "[t]he past year that I have been without my dad has been horrible. My dad always used to help me with my homework . . . and now that he isn't with us[,] I have been failing most of my classes this year." *Id.* at 376. Her one-page statement did not mention her "deformed" braces or explain the

burdens of her newfound responsibility of caring for her younger siblings in her father's absence, circumstances that Dr. Giardino's report referred to, as did Martinez's testimony. Yet, the IJ concluded that "the record does not sufficiently show that [Martinez's children's] quality of life would be negatively affected as a result of [Martinez's] removal in a way that would rise to the level of exceptional and extremely unusual hardship[,]"even while denying Emely an opportunity to answer questions concerning facts omitted from her single-page letter. SA at 22. It strikes us that the IJ had a duty to inquire of Emely further, as she was willing, and the record provides no reason to suggest she could not testify. *See Yang v. McElroy*, 277 F.3d 158, 162 (2d Cir. 2002) ("[T]he IJ whose decision the Board reviews, unlike an Article III judge, is not merely the fact finder and adjudicator but also has an obligation to establish the record."); *see also* 8 C.F.R. § 1240.1(c) ("The immigration judge *shall* receive and consider material and relevant evidence") (emphasis supplied).[18]

In addition, the IJ placed weight on his observation that the record lacked "a written statement from [the children's mother, Ochoa] discussing her financial or other difficulties" at the same time concluding that "the record does not sufficiently show that other family and/or community members cannot . . . provide support for the children or [Ochoa] should they require it." SA at 24. Silva Cadena's and Nava Ramirez's three-page written statements suggest strongly that both could have provided relevant additional first-hand testimony concerning the "financial or other difficulties" of Ochoa and the children that the IJ found lacking in the record and answered the IJ's questions in this regard. *See, e.g.*, CAR at 334, Silva Cadena Aff. ("[Ochoa] is very overwhelmed

---

[18] Further, consistent with the view of the IJ as an active participant in immigration hearings, the Immigration Court Practice Manual (a Department of Justice publication) empowers IJs to "ask questions of the respondent and all witnesses at any time during the hearing." Immigration Court Practice Manual § 4.16(e) (2020).

taking care of the three kids on her own. I know [she] relies on Emely to look out for her brother and sister a lot too but she's only 13 [years old]."); *id.* at 368, Nava Ramirez Aff. ("Emely has mentioned she is depressed. [Ochoa] says she doesn't have time to take her to therapy[,] but I think [Emely] needs it.").

Similarly, the twelve-page report provided by Dr. Giardino offered ample support for Martinez's claim that his children would suffer exceptional and extremely unusual hardship if he were removed. Although the IJ purported to give Dr. Giardino's psychological evaluation "full weight," he identified apparent inconsistences or omissions in the report. CAR at 256. For instance, the IJ found that Dr. Giardino "did not indicate" that the children's mental health symptoms could not be improved through treatment, despite Dr. Giardino's clinical prediction that Martinez's removal would put the children, already vulnerable, at special risk of developing severe long-term psychological problems. SA at 22. The record suggests that Dr. Giardino was in a position to address and elaborate on the issues that the IJ found inadequately developed in the record and important to his decision to deny relief. The extent to which Dr. Giardino's treatment recommendations, such as deep breathing exercises, would alleviate the risk of severe psychological damage, should have been inquired into before reaching a conclusion on "exceptional and extremely unusual hardship"—a determination that we have called "subtle" and described as necessitating careful factfinding. *Mendez v. Holder*, 566 F.3d 316, 323 (2d Cir. 2009).

Our view that the IJ abused his discretion by denying the requested continuance finds further support in the views of a group of former IJs and former members of the BIA, who submitted a brief as *amicus curiae* in support of Martinez. *See generally* Amicus Br. of Former Immigration Judges and Members of the Board of Immigration Appeals. *Amici* explain persuasively that "live testimony is the primary method of factfinding" in immigration court and that it is particularly important when it "clarif[ies] expert

19

opinions, and . . . [involves] children who may not be able to prepare thorough written submissions." *Id.* at 4, 8–9.[19]

We are troubled by the IJ's refusal to hear live testimony especially because, as described, Martinez sought to present live testimony of certain witnesses who may have been able to provide the very evidence of hardship that both the IJ and BIA considered lacking from his application for cancellation. *See* SA at 3 ("[W]e agree with the [IJ] that [Martinez] has not established that a qualifying relative would suffer hardship that is substantially different from, or beyond, that which would normally be expected from the removal of a parent from the United States."). Had they been permitted to testify, Martinez's expert and fact witnesses would have had an opportunity to clarify whether unnamed family members who also lived at the two-bedroom apartment could or could not care for the children in Martinez's absence. *Id.* at 26. In addition, Dr. Giardino could have elaborated on his statement that "[i]t is [] my strongest recommendation that [] Martinez be permitted to remain in the United States in order to continue to provide this crucial support to his three children[,]" CAR at 357, possibly distinguishing the case of these three children from that of others. Emely could have described the hardship she and her siblings have experienced, beyond the one-page letter that she submitted to the

---

[19] We reject the government's argument that we lack jurisdiction to consider the issues raised in this brief. The government submits that in the agency proceedings, Martinez did not sufficiently raise before the BIA the argument "that live testimony is necessary to determine hardship," as *amici* assert and as we consider here. Respondent's Br. at 27 n.5. "[W]e have never held that a petitioner is limited to the exact contours of his argument below." *Gill v. I.N.S.*, 420 F.3d 82, 86 (2d Cir. 2005). Rather, we have explained, "§ 1252(d)(1) bars the consideration of bases for relief that were not raised below, and of general issues that were not raised below, but not of specific, subsidiary legal arguments, or arguments by extension, that were not made below." *Id.*; *see* 8 U.S.C. § 1252(d)(1). Here, the arguments raised in the brief *amicus curiae* are legal and procedural arguments supporting Martinez's contention that the IJ erroneously denied his request for a continuance, a contention that Martinez *did* raise before the BIA. The government has had an ample chance to respond to the arguments and we reject the effort to foreclose our consideration of them.

20

IJ. All could potentially have testified to the critical issue of the ability or inability of Ochoa, the children's mother, to provide for their basic needs. We see no valid reason to have denied them the opportunity, after Martinez's request for a brief continuance.

The IJ's comments that the witnesses' live testimony was unnecessary concern us particularly in light of his apparent failure to read their statements *before* presiding over Martinez's removal hearing and ruling on his motion to permit live testimony. As Martinez points out in his petition for review, the record suggests that the IJ had not read Dr. Giardino's report before deeming his live testimony duplicative of his written report. In rejecting Martinez' request to allow Dr. Giardino to testify by telephone, the IJ commented, "[Y]ou have a detailed affidavit from him that I *can* review and that I *assume* would cover all the issues." *Id.* at 256 (emphasis supplied). We have admonished that an IJ should not engage in "speculation" or "prejudgment" about a petitioner's case and then "refuse[] to hear testimony that would have challenged those assumptions." *Ali v. Mukasey*, 529 F.3d 478, 492 (2d Cir. 2008) (quoting *Lopez-Umanzor,* 405 F.3d at 1059); *see also Rodriguez Galicia v. Gonzales*, 422 F.3d 529, 540 (7th Cir. 2005) (holding that petitioner was denied her right to meaningful opportunity to be heard where expert witnesses were not permitted to testify, and observing that "[t]he opportunity for the IJ to ask questions and for the experts to answer . . . could only have been accomplished with live testimony."). Here, the IJ appears to have precluded potentially relevant live testimony after only a cursory review of the witnesses' written statements. That restrictive decision runs counter to the IJ's obligation to build the record before him. *See Yang*, 277 F.3d at 162 ("[T]he IJ whose decision the Board reviews, unlike an Article III judge, is not merely the fact finder and adjudicator but also has an obligation to establish the record.").

This is not to say that an IJ must always permit live testimony or that denying a continuance to allow for live testimony necessarily constitutes an abuse of discretion.

But denials of such requests must be carefully considered and testimonial proffers reviewed closely before disallowing an opportunity for live testimony, particularly where an adverse ruling on the very topic of the proposed testimony seems likely. Here, we observe, the IJ offered no reason for denying the continuance beyond his statement that the testimony was unnecessary. He did not rule that an adjournment would be unreasonable, onerous, or prejudicial. Having found the sole basis for this denial to be erroneous, we readily decide, then, that the IJ exceeded the permissible bounds of his discretion in the circumstances of this case.

It is true that the March 4 request for a continuance was not the first made in the agency proceedings. It is also true that, even if Martinez is able to establish that his children will experience exceptional and extremely unusual hardship should he be removed, the agency may still be entitled to deny his application for cancellation based on a failure to satisfy the statutory good moral character requirement, *see* n.2, *supra*, an alternative ground on which the IJ based his decision. Even so, remand for failure to provide this single continuance is warranted here. A decision on Martinez's application for cancellation will be more properly made on a complete record in which Martinez has had a full and fair opportunity to address, with live testimony, all of the factors relevant to his application, and particularly those regarding the emotional and personal welfare of his three children, the apparent incapacity of their mother, and other circumstances that could be addressed by Dr. Giardino as well as Emely, Nava Ramirez, and Silva Cadena. Where the agency relied on the absence of evidence to support its conclusion and yet denied the petitioner a reasonable opportunity to present relevant evidence, the ruling cannot stand.

We therefore conclude that the IJ's denial of Martinez's request for a continuance "cannot be located within the range of permissible decisions" and that the Board erred when it affirmed that denial. *Rajah*, 544 F.3d at 453 (internal quotation marks omitted).

22

**CONCLUSION**

For the foregoing reasons, the petition for review is **GRANTED**. The case is **REMANDED** to the agency for further consideration of Martinez's application.