22-1197-cr
*United States v. Suquilanda*

# In the
# United States Court of Appeals
# For the Second Circuit

August Term, 2023
Argued: October 23, 2023
Decided: September 13, 2024

Docket No. 22-1197-cr

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

MANUEL ANTONIO SUQUILANDA, AKA SEALED DEFENDANT 1, AKA EDWIN
SUSQUILANDA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of New York
No. 21-cr-263, Victor Marrero, *Judge.*

Before:     NEWMAN, LEE, NATHAN, *Circuit Judges.*

Defendant-Appellant Manuel Antonio Suquilanda challenges his
indictment and conviction for unlawfully reentering the United States, in violation
of 8 U.S.C. § 1326, arguing that his conviction was invalid on two grounds. First,
he contends that the proceedings that resulted in his initial removal from the

United States were improperly initiated by the Department of Homeland Security. Specifically, he argues that his prior removal was invalid because the Immigration Court that ordered his removal—a prerequisite for illegal reentry—did not have jurisdiction to do so. He argues that the Immigration Court lacked jurisdiction because the statutorily required Notice to Appear ("NTA") that he received was missing the place of hearing and the address-of-filing information. Second, he challenges the constitutionality of § 1326—the "illegal reentry statute" under which he was indicted—and argues that it violates the Fifth Amendment's equal protection guarantee by discriminating against people from Latin America. After the District Court denied Suquilanda's motion to dismiss the indictment on these two grounds, Suquilanda pleaded guilty to a one-count indictment charging him with illegal reentry but preserved the right to appeal the above issues.

Upon due consideration, we hold that any defect in the NTA did not strip the Immigration Court of jurisdiction to order Suquilanda's initial removal, and that 8 U.S.C. § 1326 does not violate the Fifth Amendment's equal protection guarantee. Accordingly, we **AFFIRM** the judgment of the District Court.

————————————

WON S. SHIN (Jane Y. Chong, *on the brief*), Assistant United States Attorneys, *for* Damian Williams, United States Attorney for the Southern District of New York, NY, *for Appellee*.

ERWIN CHEMERINSKY, University of California, Berkeley School of Law, Berkeley, CA (S. Isaac Wheeler & Allegra Glashausser, Federal Defenders of New York, Inc., New York, NY, *on the brief*), *for Defendant-Appellant*.

Nicholas D. Espiritu, Los Angeles, CA & Max S. Wolson, Washington, DC, National Immigration Law Center; Ghita Schwarz, LatinoJustice PRLDEF, New York, NY, *for Advocates for Basic Legal Equality, Justice Strategies, LatinoJustice PRLDEF, Legal Aid Justice Center, Massachusetts Law Reform Institute, and National*

*Immigration Law Center, amici curiae in support of Defendant-Appellant.*

Ann Garcia, Khaled Alrabe, National Immigration Project of the National Lawyers Guild, Washington, DC; Charles Roth, National Immigrant Justice Center, Chicago, IL, *for Legal Service Providers and Immigrant Rights Organizations, amici curiae in support of Defendant-Appellant.*

Michele A. McKenzie, McKenzie Scott PC, San Diego, CA, *for Asian Americans Advancing Justice, Human Rights First, and Northwest Immigrant Rights Project, amici curiae in support of Defendant-Appellant.*

Alexander G. Tievsky, Edelson PC, Chicago, IL, *for the Center for Immigration Law and Policy, the Aoki Center for Critical Race and Nation Studies, and Professor Eric Fish, amici curiae in support of Defendant-Appellant.*

Philip L. Torrey, Crimmigration Clinic, Harvard Law School, Cambridge, MA, *for Dr. S. Deborah Kang, amicus curiae in support of Defendant-Appellant.*

Amanda Valerio, Washington, DC & Alexia D. Korberg, Melina Meneguin Layerenza, Patrick McCusker, New York, NY, Paul, Weiss, Rifkind, Wharton & Garrison LLP, *for Immigration Scholars, amici curiae in support of Defendant-Appellant.*

EUNICE C. LEE, *Circuit Judge*:

Defendant-Appellant Manuel Antonio Suquilanda challenges his indictment and conviction for unlawfully reentering the United States, in violation

3

of 8 U.S.C. § 1326, arguing that his conviction was invalid on two grounds. First, he contends that the proceedings that resulted in his initial removal from the United States were improperly initiated by the Department of Homeland Security. Specifically, he argues that the Immigration Court that ordered his removal—a prerequisite for illegal reentry—did not have jurisdiction to do so because the statutorily required Notice to Appear ("NTA") that he received was missing the place of hearing and the address-of-filing information. Second, he challenges the constitutionality of § 1326—the "illegal reentry statute" under which he was indicted—and argues that it violates the Fifth Amendment's equal protection guarantee by discriminating against people from Latin America. After the District Court denied Suquilanda's motion to dismiss the indictment on these two grounds, Suquilanda pleaded guilty to a one-count indictment charging him with illegal reentry but preserved the right to appeal the above issues.

Upon due consideration, we hold that any defect in the NTA did not strip the Immigration Court of jurisdiction to order Suquilanda's initial removal, and that 8 U.S.C. § 1326 does not violate the Fifth Amendment's equal protection guarantee. Accordingly, we **AFFIRM** the judgment of the District Court.

4

# I. BACKGROUND

## A. Factual & Procedural History

Manuel Antonio Suquilanda immigrated to the United States from rural Ecuador as a teenager. Following Suquilanda's conviction in 2004 for rape in the second degree, in violation of New York Penal Law § 130.30, the Department of Homeland Security initiated removal proceedings against Suquilanda in Immigration Court.

To initiate the removal of an individual from the United States under the Immigration and Nationality Act ("INA"), the government must provide that individual with "written notice" of the removal proceedings. 8 U.S.C. § 1229(a)(1). The written notice comes in the form of a "Notice to Appear," commonly known as an NTA. *Id.* Two required components of an NTA are at the heart of Suquilanda's challenge to the validity of his initial removal: (1) the hearing information for removal proceedings, and (2) the address of the Immigration Court with jurisdiction over the proceedings. Congress specified that an NTA, among other things, must include hearing information—which includes the "time and place at which the proceedings will be held." *Id.* § 1229(a)(1)(G)(i). Pursuant

5

to its express statutory authority to effectuate the purposes of the INA,[1] the Attorney General has elaborated on the requirements for an NTA through implementing regulations. Relevant here, the regulations require that an NTA also include the "address of the Immigration Court where the Service will file" the NTA. 8 C.F.R. § 1003.15(b)(6).[2]

On March 23, 2005, Suquilanda was served an NTA, but it did not contain the statutorily required date, time, and place of his initial removal hearing, or the regulatorily required address of the Immigration Court at which his NTA was to be filed. Five days later, on March 28, Suquilanda received a notice of hearing that informed him of the date, time, and place of his initial hearing. Separately, on the same day, Suquilanda received a notice which informed him of the address of the Immigration Court at which his NTA was to be filed. In April 2005, an Immigration Judge ordered Suquilanda's removal, and he was deported from the United States the following May. At some point thereafter, Suquilanda returned to the United States.

---

[1] "The Attorney General shall establish such regulations . . . as the Attorney General determines to be necessary for carrying out [the Immigration and Nationality Act]." 8 U.S.C. § 1103(g)(2).

[2] The use of "Service" within the INA in the context of this case refers to U.S. Immigration and Customs Enforcement, commonly referred to as "ICE." *See* 8 C.F.R. § 1.2.

The INA makes it a crime for someone to enter the United States after their removal without the consent of the Attorney General. *See* 8 U.S.C. § 1326. Pursuant to that authority, Suquilanda was indicted on April 21, 2021, for allegedly unlawfully reentering the country after having been removed subsequent to a conviction for an aggravated felony.

Suquilanda moved for dismissal of the indictment on the grounds that: (1) the Immigration Court lacked jurisdiction for his initial removal in 2005—arguing that this purported lack of jurisdiction voided the current indictment since a prior removal is a necessary prerequisite to unlawful reentry; and (2) 8 U.S.C. § 1326, the illegal reentry statute, is unconstitutional because it discriminates against people from Latin America and was enacted with racial animus.[3] The District Court rejected Suquilanda's request for a factual or evidentiary hearing, or to supplement the record with lengthier briefing. The District Court denied the motion to dismiss the indictment on both grounds. *See United States v. Suquilanda*, No. 21-CR-263, 2021 WL 4895956, at *1 (S.D.N.Y. Oct. 20, 2021) (Marrero, J.).

---

[3] Suquilanda uses the terms "Latinx person(s)" and "Latinos" interchangeably throughout his brief to refer to "people from Latin America" or "Latin Americans." We will use "Latin Americans" or "people from Latin America" in our decision.

## B.     The District Court Decision

On the issue of whether the initially defective NTA deprived the Immigration Court of jurisdiction, the District Court held that the defects did not deprive the Immigration Court that ordered Suquilanda removed in 2005 of the authority to do so. *Suquilanda*, 2021 WL 4895956, at \*5. First, the District Court determined that Suquilanda's NTA could be, and in fact was, cured of the missing time, date, and place information for his initial hearing—largely by relying on this Court's precedent in *Banegas Gomez v. Barr*, 922 F.3d 101 (2d Cir. 2019). *See Suquilanda*, 2021 WL 4895956, at \*2–3. Next, the District Court concluded that the address-of-filing requirement was a "claims processing" regulatory requirement and not a jurisdictional one, meaning that its absence could not strip an Immigration Court of its subject-matter jurisdiction. *Id.* at \*5. Although the District Court disagreed with the notion that the missing address of filing was a curable defect—unlike the missing hearing information that was curable in *Banegas Gomez*—it still concluded that the Immigration Court nonetheless had jurisdiction based on principles of agency deference to the BIA's decision in *Rosales Vargas*. *Id.* at \*4. In *Rosales Vargas*, the BIA held that the relevant regulations are "claim-processing" or "internal docketing" rules that are curable. *Matter of Rosales Vargas*, 27 I. & N. Dec. 745, 749 (B.I.A. 2020) (holding that the notice requirements

8

of 8 C.F.R. § 1003.15(b)—which include address of filing—were curable and not jurisdictional).

On the challenge to the constitutionality of the illegal reentry statute, the District Court determined that the 1929 Act[4]—a predecessor to the modern-day 8 U.S.C. § 1326—was promulgated with discriminatory intent and was "undoubtedly enacted in the face of bald racial animus towards Hispanic people." *Suquilanda*, 2021 WL 4895956, at *5. But the District Court ultimately held that "this evidence bears little weight on Section 1326, which was officially reenacted as a felony offense in 1952 as part of the broader Immigration and Nationality Act" and "has been modified a number of times since 1952 in order to enhance penalties or otherwise rebalance the deterrent effect of the law." *Id.* This led the District Court to conclude that, while there was evidence of discriminatory intent behind the 1929 Act, Suquilanda had not carried his burden of proof to show that the subsequently enacted and amended § 1326 was motivated by discriminatory intent sufficient to assert an equal protection claim. *Id.* The District Court explained that the lack of evidence to support discriminatory intent in the reenactment of, and

---

[4] As discussed in more depth *infra*, the name of the immigration statute of 1929 that criminalized reentry is disputed by the parties. For our purposes, we will refer to it as the "1929 Act." *See* Pub. L. No. 70-1018, 45 Stat. 1551.

amendments to, § 1326 meant that Suquilanda's claim failed regardless of whether the constitutional challenge was reviewed under a rational basis standard or received heightened scrutiny under the *Arlington Heights* factors.[5] *Id.* at *5 n.3.

After the denial of the motion to dismiss, Suquilanda pleaded guilty in December 2021 to a one-count indictment for unlawfully reentering the United States in violation of 8 U.S.C. § 1326(a) and (b)(2). The plea agreement contained a provision preserving Suquilanda's right to appeal the collateral attack on his 2005 removal order and his equal protection challenge to § 1326.

Suquilanda's appeal timely followed. In addition to challenging the merits of the District Court's decision, Suquilanda alternatively seeks a remand in order to present additional evidence in support of his challenge to the constitutionality of the reentry statute. After oral argument on appeal, we requested and received supplemental briefing on the issue of what specific evidence Suquilanda did not have the opportunity to submit below, and whether remand is appropriate to allow submission of these materials.

---

[5] *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977) (setting forth a variety of factors based on circumstantial and direct evidence that courts may consider to be probative of intent to discriminate).

## II. DISCUSSION

### A. Standard of Review

We review *de novo* a district court's denial of a motion to dismiss an indictment based on a collateral attack on a deportation order. *United States v. Gill*, 748 F.3d 491, 496–97 (2d Cir. 2014). "We review a district court's findings of fact for clear error, but we review de novo a district court's application of th[ose] facts to draw conclusions of law." *United States v. Aumais*, 656 F.3d 147, 154 (2d Cir. 2011) (internal quotation marks omitted). Further, we review *de novo* challenges to the constitutionality of a statute. *United States v. Wasylyshyn*, 979 F.3d 165, 172 (2d Cir. 2020). Last, "whether the court applied the correct burden of proof is a question of law subject to plenary review." *Abbott v. Perez*, 585 U.S. 579, 607 (2018).

### B. Notice to Appear Defects

As an initial matter, Suquilanda's challenge to the missing hearing information in his original NTA is foreclosed by this Court's precedent. In *Banegas Gomez*, this Court held that an NTA lacking information regarding the date and time of the hearing did not divest an Immigration Court of jurisdiction when a subsequent notice contained the missing hearing information. *See* 922 F.3d at 112 ("We conclude that an NTA that omits information regarding the time and date of the initial removal hearing is nevertheless adequate to vest jurisdiction in the

11

Immigration Court, at least so long as a notice of hearing specifying this information is later sent to the [individual].").  Suquilanda attempts to relitigate the *Banegas Gomez* Court's decision, but the facts here fall squarely within the ambit of our holding there. [6]  Suquilanda received an NTA that omitted the time and date of the initial removal hearing, but a subsequent notice specifying this information was sent to him five days later.  While it may be the case that an NTA missing hearing information is incomplete, *see Campos-Chaves v. Garland*, 144 S. Ct. 1637, 1649 (2024) ("NTA which ordered [individual] to appear 'on a date to be set at a time to be set' was insufficient to satisfy [8 U.S.C.] § 1229(a)(1)" (quoting *Pereira v. Sessions*, 585 U.S. 198, 206 (2018))), it is also the case that, under *Banegas Gomez*,

---

[6] Suquilanda raises the argument that a 1996 transitional session rule dislodges the premise in *Banegas Gomez* that no "statutory glue" tethers the Immigration Court's jurisdiction to the requirements of § 1229(a).  *Banegas Gomez*, 922 F.3d at 111.  The session rule allowed the Attorney General to retroactively apply the new procedures under certain conditions and provided that a notice of hearing "shall be valid as if provided under [§ 1229] to confer jurisdiction on the immigration judge."  IIRIRA, Pub. L. No. 104-208, Div. C, § 309(c)(2).  It has been contended that "the transition statute's use of ['jurisdiction'] in reference to the notice requirements of § 1229 suggests that Congress understood the NTA to have jurisdictional significance."  *See United States v. Bastide-Hernandez*, 39 F.4th 1187, 1195 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 755 (2023) (Friedland, J., concurring).  Even if this provision were a clear statement of the jurisdictional nature of § 1229(a)'s hearing information requirements, our precedent in *Banegas Gomez* controls.  *See United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022) (noting the "longstanding rule that a panel of our Court is bound by the decisions of prior panels until such times as they are overruled either by an en banc panel of our Court or by the Supreme Court[,]" with the narrow exception of an intervening Supreme Court decision (internal quotations omitted)).

12

922 F.3d at 112, any deficiency in Suquilanda's NTA due to missing hearing information was rectified by the later notice he received providing information about his scheduled hearing. As such, the Immigration Court did not lack jurisdiction because of a deficiency in the NTA based on the omission of the place-of-hearing information.

Suquilanda's challenge to the missing address-of-filing information, on the other hand—which was not addressed by *Banegas Gomez*—presents a novel issue for which we must offer clarity. A key distinction between the NTA requirements for the hearing information and the address-of-filing information is that the address-of-filing requirement is derived solely from the regulatory text promulgated by the agency, and not the statutory text promulgated by Congress, as is the case for the hearing information requirement.[7] As explained below, because we conclude that address of filing is a nonjurisdictional requirement, we hold that its omission also did not strip the Immigration Court of jurisdiction.

Suquilanda argues that under § 1003.14(a) and § 1003.15(b)(6) of the federal regulations, the jurisdiction of a specific Immigration Court is triggered *only* by

---

[7] Notably, though not relevant to our decision, the requirement for the NTA to include hearing information is included in both the statutory text and the implementing regulations. *See* 8 U.S.C. § 1229(a)(1)(G)(i); *see also* 8 C.F.R. § 1003.18(b).

13

the filing of an NTA that includes, *at the time of service*, the address of the Immigration Court where it was to be filed (otherwise referred to as the address of filing). *See* 8 C.F.R. §§ 1003.14(a), 1003.15(b)(6). He contends that because his NTA lacked the Immigration Court's address information at the time of service, the Immigration Court that ordered him removed in 2005 necessarily lacked jurisdiction to do so, and thus his removal is void. He comes to this conclusion by relying on § 1003.14(a) of the regulations, which states that "[j]urisdiction vests, and proceedings before an Immigration Judge commence, when [the NTA] is filed with the Immigration Court by the Service." *See* Appellant's Br. at 27–28. That section is followed by § 1003.15(b)(6), which states that the aforementioned NTA "must also include . . . [t]he address of the Immigration Court where the Service will file the . . . Notice to Appear." Suquilanda relies heavily upon the use of the word "jurisdiction" in § 1003.14(a) to contend that the absence of the information cannot be cured. *See id.* at 23, 26–28. The government opines that missing address-of-filing information, like hearing information, can be supplied later, or alternatively, even if the failure to include the filing address is not curable, the omission of it did not deprive the Immigration Court of jurisdiction because it is a

14

claim-processing rule that does not determine the Immigration Court's subject-matter jurisdiction.

"[J]urisdictional rules . . . govern a court's adjudicatory authority, and nonjurisdictional claim-processing rules . . . do not." *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) (internal quotations marks omitted); *see also Donnelly v. Controlled Application Rev. & Resol. Program Unit*, 37 F.4th 44, 54 (2d Cir. 2022) (same). We apply a clear statement rule to assess whether a statutory requirement is jurisdictional. *See Gonzalez*, 565 U.S. at 141; *Donnelly*, 37 F.4th at 54. This simply means that Congress must clearly state that a limitation on a statute's scope is jurisdictional, and that in "the absence of such a clear statement, 'courts should treat the restriction as nonjurisdictional in character.'"[8] *Donnelly*, 37 F.4th at 54 (quoting *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013)).

It is clear that, through the INA, Congress conferred broad authority to the Attorney General to promulgate regulations (in addition to the congressionally mandated statutory requirements) to orderly conduct removal proceedings on the local level. *See* 8 U.S.C. § 1103(g)(2) ("The Attorney General shall establish such

---

[8] While "calling a rule nonjurisdictional does not mean that it is not mandatory or that a timely objection can be ignored," *Gonzalez*, 565 U.S. at 146, Suquilanda has forfeited any argument as to whether this is an incurable claim-processing defect by not raising it below. Accordingly, we do not address the merits of any such argument in this decision.

regulations . . . as the Attorney General determines to be necessary for carrying out this section."). In other words, Congress gave the Attorney General the power and discretion to effectuate this federal scheme. Pursuant to this authority, the Attorney General has promulgated a number of regulations that further operationalize the mandates of the INA. This includes narrowing removal authorization to specific immigration courts and ascertaining when removal proceedings formally commence. *See, e.g.*, 8 C.F.R. § 1003.14(a) ("Jurisdiction vests, and proceedings before an Immigration Judge commence, when [an NTA] is filed with the Immigration Court by the Service.").

Noticeably absent from the relevant statutory text is any indication that Congress gave the Attorney General the authority to define or limit its own subject-matter jurisdiction, notwithstanding the Attorney General's use of the word "jurisdiction" in § 1003.14(a). While it is accurate to characterize an NTA that is missing address-of-filing information as deficient under the agency's own regulations, *an agency's regulations cannot define the subject-matter jurisdiction* of Immigration Courts because Congress gave the Attorney General "no authority [here] to adopt rules of jurisdictional dimension." *Union Pac. R.R. Co. v. Brotherhood of Locomotive Engineers*, 558 U.S. 67, 84 (2009) (holding that though

Congress gave the National Railroad Adjustment Board ("NRAB") authority to "adopt such rules as it deems necessary to control proceedings" through the Railway Labor Act, it did not give NRAB authority over subject-matter jurisdiction). Many of our sister courts have recognized the same when confronted with this precise issue.[9] Given the address-of-filing requirement is prescribed by the agency's own regulations, it cannot serve to strip any specific Immigration Court of the subject-matter jurisdiction over removal proceedings given to Immigration Courts broadly by Congress. An Immigration Court's fundamental power to adjudicate immigration proceedings comes from Congress and from statute—not from agency regulations that seek to systematize removals. Therefore, despite the regrettable use of the word "jurisdiction" in the regulations in 8 C.F.R. § 1003.14(a), a deficient NTA lacking address-of-filing information does not deprive an Immigration Court of jurisdiction.

*     *     *

---

[9] *See United States v. Bastide-Hernandez*, 39 F.4th 1187, 1191–92 (9th Cir. 2022) (en banc), *cert. denied*, 143 S. Ct. 755 (2023); *Lopez-Munoz v. Barr*, 941 F.3d 1013, 1015–16 (10th Cir. 2019); *Ortiz-Santiago v. Barr*, 924 F.3d 956, 963 (7th Cir. 2019); *Perez-Sanchez v. U.S. Att'y Gen.*, 935 F.3d 1148, 1155–56 (11th Cir. 2019); *Pierre-Paul v. Barr*, 930 F.3d 684, 691–92 (5th Cir. 2019), *abrogated in part on other grounds by Niz-Chavez v. Garland*, 593 U.S. 155, 158–61 (2021); *United States v. Cortez*, 930 F.3d 350, 358–61 (4th Cir. 2019).

At their core, initial hearing information and address-of-filing information seek to provide critical administrative information to a non-citizen entering removal proceedings, as well as the Immigration Court and judge tasked with considering whether removal is appropriate under the relevant statutes. Of course, when an agency executes Congress's statutory mandates, certain principles of the administrative state remain evergreen. The Attorney General: (1) does not have the power to grant or rescind the subject-matter jurisdiction of Immigration Courts as it was contemplated by Congress (unless indicated otherwise by Congress itself); and (2) may not impede an individual's constitutionally protected rights, or additional rights granted to that individual by Congress, in the INA or elsewhere, *see FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (stating that "[t]he Administrative Procedure Act requires federal courts to set aside federal agency action that is 'not in accordance with law,' 5 U.S.C. § 706(2)(A)—which means, of course, *any* law," including agency failure to meet constitutional requirements (internal quotation marks omitted)). Here, at the time of Suquilanda's initial removal proceedings, the statutory and regulatory omissions in his NTA were necessarily resolved through subsequent notice containing the information at issue, and Suquilanda makes no other

18

representations that his initial deficient NTA impacted his due process, or any other, rights. Accordingly, the Immigration Court that ordered Suquilanda removed in 2005 had proper jurisdiction to do so.

## C.    The Illegal Reentry Statute

Suquilanda next challenges the constitutionality of 8 U.S.C. § 1326 on the basis that it violates his right to equal protection. Section 1326 of the INA, often referred to as the illegal reentry statute, provides that "any alien who . . . has been . . . deported, or removed [from] the United States . . . and thereafter . . . enters . . . the United States" without permission of the Attorney General, and "whose removal was subsequent to a conviction for commission of an aggravated felony, . . . shall be fined under such title, imprisoned not more than 20 years, or both." 8 U.S.C. § 1326(a)–(b)(2). Suquilanda argues that the statute violates the equal protection guarantees of the Fifth Amendment because its predecessor was promulgated with discriminatory intent, its subsequent reenactment did not eliminate the discriminatory taint, and it continues to have a disparate impact on people from Latin America.[10] He contends that the District Court erred by

---

[10] Suquilanda sought remand in part to submit evidence supporting that § 1326 has a disparate impact on Latin Americans. While we requested supplemental briefing setting forth the additional evidence that Suquilanda intended to present in the District Court,

deciding the issue prematurely without the benefit of full briefing, and ignored

evidence of racial bias. He urges this Court to enter judgment in his favor or vacate

and remand for full briefing, an evidentiary hearing, and proper consideration of

the *Arlington Heights* factors. For the reasons outlined below, we reject

Suquilanda's equal protection claim.

### 1.    Level of Scrutiny

Before we address Suquilanda's substantive challenge to § 1326, we first

address the level of scrutiny applicable to his equal protection challenge. *See*

*Hayden v. Paterson*, 594 F.3d 150, 170 (2d Cir. 2010) ("[T]he threshold question for

any analysis under the Equal Protection Clause is whether the highly deferential

rational basis review applies, or instead whether the legislation involves a suspect

class or a fundamental right resulting in the application of a stricter form of

scrutiny."). The Fifth Amendment of the Constitution provides that no person

shall be "deprived of life, liberty, or property, without due process of law." U.S.

Const. amend. V. This clause contains an implicit guarantee of equal protection

under federal law which is identical to the explicit guarantee under state law set

---

we need not address the evidence he raises in support of his disparate impact argument given that we conclude Suquilanda has failed to demonstrate discriminatory intent.

forth in the Fourteenth Amendment. *See Sessions v. Morales-Santana*, 582 U.S. 47, 52 n.1 (2017).

When a statute makes an express classification on the basis of race, it "is presumptively invalid and can be upheld only upon an extraordinary justification." *Shaw v. Reno*, 509 U.S. 630, 643–44 (1993) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979)). The text of § 1326 contains no express race-based classification and is facially neutral. However, a statute that is facially neutral may still violate equal protection principles if a discriminatory purpose was a motivating factor for the legislation. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). In such a case, a constitutional challenge will need to establish a prima facie case "by showing that animus against the protected group was a significant factor in the position taken by the [legislative] decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016) (quoting *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995)). If the plaintiff satisfies the burden of showing a discriminatory purpose was a motivating factor, the burden next shifts to the government to show that "the same decision would have resulted even had the impermissible purpose not

been considered." *Arlington Heights*, 429 U.S. at 270 n.21. If the government is able to carry this burden, there is no equal protection violation, even if there is evidence that the legislature had a discriminatory motive. *Id.*

Suquilanda argues that the *Arlington Heights* burden-shifting framework applies here because his challenge is to a facially neutral law accused of violating equal protection. The government argues that though "[l]aws drawing distinctions based on a suspect class ordinarily have to satisfy heightened scrutiny[,] . . . [f]ederal immigration laws are an exception to that general rule." Appellee's Br. at 35 (internal citation omitted). While the government believes we should review this challenge under rational basis review, it nonetheless contends that the statute survives under both standards—rational basis or heightened scrutiny pursuant to burden shifting under *Arlington Heights*.

Contrary to the government's assertion, there is no general rule that federal immigration laws challenged for violating the Constitution should receive rational basis review. *See, e.g.*, *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1142 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 703 (2024) ("Neither the Supreme Court nor we have directly addressed the issue regarding which standard of review applies to equal protection challenges to immigration laws."); *see also United States v. Amador-*

22

*Bonilla*, 102 F.4th 1110, 1115 (10th Cir. 2024) (same); *United States v. Sanchez-Garcia*, 98 F.4th 90, 98 (4th Cir. 2024) (same). It is also true that, in certain instances, laws and policies related to immigration, but challenged for constitutional infirmity, will receive more deference by the judiciary if it is related to a matter of national security, given the general proximity and authority of the political branches in such matters. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 673–76, 703–04 (2018) (applying rational basis review to a First Amendment challenge to the president's executive order banning immigration from countries with Muslim-majority populations based, in part, on a purported national security rationale for the order). But it is certainly not the case that immigration laws challenged for violating the Constitution will receive short shrift by courts simply because immigration policy can be closely associated with national security or committed to the discretion of the political branches of government. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 34 (2020) (applying rigorous judicial review to the Department of Homeland Security's recission of the Deferred Action for Childhood Arrivals ("DACA") program despite the immigration context).

Moreover, as other circuits have highlighted, "§ 1326 is a criminal statute, not a law that directly governs the admission or exclusion of non-citizens," so it

does not fall squarely within Congress's power with respect to immigration and national security. *Sanchez-Garcia*, 98 F.4th at 98; *see also United States v. Barcenas-Rumualdo*, 53 F.4th 859, 864–65 (5th Cir. 2022) ("[Section] 1326 relates to those already excluded, so it does not unequivocally fall under Congress's exercise of power over admission and exclusion.").

With these considerations in mind, and given that Congress's authority to adopt criminal immigration penalties is subject to constitutional restraints and the accompanying levels of scrutiny, we will proceed with conducting our review under the *Arlington Heights* framework. *See, e.g.*, *Dep't of Homeland Sec.*, 591 U.S. at 34 (invoking the *Arlington Heights* framework to assess the equal protection challenge to the recission of DACA program).

### 2. Arlington Heights Analysis

Suquilanda submits that discrimination against Latin Americans was a motivating factor in criminalizing reentry both in the promulgation of the Immigration and Nationality Act in 1952 (the "1952 Act")—which included § 1326—as well as in the promulgation of its predecessor in the 1929 Act. The government argues that Suquilanda fails to shift the burden to the government, not only because of a lack of evidence of Congress's discriminatory intent in 1929,

but certainly because of the lack of it in 1952, when Congress reenacted § 1326. Upon review, we conclude that Suquilanda has failed to meet his burden of establishing a prima facie case.

To meet his burden of establishing discriminatory intent, Suquilanda must show that the lawmaking body must have "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney*, 442 U.S. at 279. A statute that has "a racially disproportionate impact" will not be held unconstitutional in the absence of "[p]roof of racially discriminatory intent or purpose." *Hunter v. Underwood*, 471 U.S. 222, 227–28 (1985) (quoting *Arlington Heights*, 429 U.S. at 264–65). This means that Suquilanda must show that "racial discrimination [was] a 'substantial' or 'motivating' factor behind enactment of the law." *Hunter*, 471 U.S. at 228 (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). But because discriminatory purpose or intent "is rarely susceptible to direct proof, a [court] facing a question of discriminatory intent must make 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Mhany*, 819 F.3d at 606 (quoting *Arlington Heights*, 429 U.S. at 266). *Arlington Heights* recognizes this reality by broadening the scope of what may serve as

evidence of intent, and permits consideration of multiple factors such as: whether "[t]he impact of the official action . . . bears more heavily on one race than another"; the "historical background of the decision"; the "specific sequence of events leading up to the challenged decision"; "[d]epartures from the normal procedural sequence," or "[s]ubstantive departures"; and "legislative or administrative history." 429 U.S. at 266–68 (internal quotation marks removed).

As evidence of discriminatory intent, Suquilanda relies upon, *inter alia*, the legislative history of the 1929 Act and the 1952 reenactment through the passage of the INA.[11]

To begin, there is compelling evidence to support that the 1929 Act was promulgated with racial animus as a motivating factor. To start, while the title of the Act at passage was a "bill . . . making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law,"

---

[11] While the entire 1950 Senate Report and relevant portions of the Congressional Record were not submitted below, this legislative history is, in part, the reason Suquilanda seeks remand—to submit the evidence into the record in support of demonstrating § 1326's alleged unconstitutionality. He addressed specific portions of the Report in briefing on appeal, and the Court sought additional briefing after oral argument in aid of coming to a resolution. The government argued that remand is not necessary because the District Court could have taken judicial notice of legislative history. While taking judicial notice of legislative history and being presented with affirmative arguments based on that history are two different things, for efficiency, we will accept and address arguments related to the Senate Report and Congressional Record in our decision.

26

70 Cong. Rec. 4951 (1929), for a period of time before then, it was referred to as the "undesirable aliens act of 1929," 70 Cong. Rec. 3542 (1929). This connotation of racial animus in the naming of the statute weighs in favor of a finding of discriminatory motive on the part of the 1929 Congress. In addition, the submitted statements from the legislative history of the 1929 Act, a few of which were reiterated in some form by two of the same members of Congress in 1952, are reprehensible. Repeated references expressed a desire to allow immigration from white populations. Certain members of Congress, and supporters of proposed bills in 1926 and 1928 that laid the groundwork for the 1929 Act, openly expressed animus against Mexicans specifically, and Latin Americans broadly. *See, e.g.*, 69 Cong. Rec. 2817–18 (1928) (statement of Rep. John Box) ("The Mexican peon is a . . . blend of low-grade Spaniard, peonized Indian, and negro slave [that] mixes with negroes, mulat[t]oes, and other mongrels, and some sorry whites, already here. The prevention of such mongrelization and the degradation it causes is one of the purposes of our laws which the admission of these people will tend to defeat."). This, and other statements from members of Congress in the lead up to the 1929 Act,[12] are racist, and most circuits that have considered the motivation behind the

---

[12] *See, e.g.*, 69 Cong. Rec. 2817–18 (1928) (Representative Box's degrading and racist remarks on why Mexican immigration should be restricted to "protect[] . . . American

27

1929 Act have acknowledged its abhorrent origins. *See Amador-Bonilla*, 102 F.4th at 1116 (Tenth Circuit highlighting that "the 1929 Act's passage is full of repugnant ideas and language"); *Sanchez-Garcia*, 98 F.4th at 99 (Fourth Circuit noting "the ugly origin of the 1929 Act"); *Barcenas-Rumualdo*, 53 F.4th at 866 (Fifth Circuit noting that appellant "paints a vivid picture of the [1929 Act's] troubling history"). But as our peers have said before us, we are constrained by the confines of the balancing act that comes with reviewing a facially neutral statute, and to meet this burden, Suquilanda must show that Congress "reaffirmed," at least in part, the animus behind the 1929 Act via § 1326's promulgation in 1952. *Feeney*, 442 U.S. at 279. Thus, we turn our focus to the historical backdrop and legislative history of the 1952 Act.

In 1952, Congress "attempt[ed] to bring within one cohesive and comprehensive statute the various laws relating to immigration, naturalization, and nationality," through the Immigration and Nationality Act. *Henderson v. INS*,

---

racial stock from further degradation"); 72 Cong. Rec. 10844–45 (1930) (House representatives discussing "put[ting] Mexican immigration on a quota basis" and citing Congress's "great responsibility of protecting the country from the menace of infiltration by alien people whose . . . racial qualities threaten serious injury to the country" as justification for a restrictive immigration bill); *Restriction of Western Hemisphere Immigration: Hearings on S. 1296, S. 1437, and S. 3019 Before the S. Comm. on Immigr.*, 70th Cong. 25 (1928) (Senator Coleman Blease stating that Mexicans are "[p]eacable" because "[t]hey know when they get over here they have got to behave or we will kill them.").

157 F.3d 106, 116 (2d Cir. 1998) (quoting H.R. Rep. No. 82-1365, at 27 (1952)). Suquilanda argues that this 1952 reenactment did not cure the taint of the 1929 Congress's racial animus because the illegal reentry statute was left largely unaltered, and the 1950 Senate Report and congressional record evidences further discriminatory intent.

Suquilanda highlights various portions of the legislative record to support his claim, including the repeated use of the racial slur "wetback" throughout the 1950 Senate Report. *See, e.g.*, S. Rep. 81-1515, at 573, 579, 580, 584, 585, 586 (1950). Suquilanda also underscores the introductory chapter of the Senate Report's designations of people into racial categories based on skin color—used to demonstrate racial hierarchy throughout the report. *Id.* at 7 (creating five racial categories called the "white race," "yellow race," "black race," "brown race," and "red race"). He observes the hostility in the Senate Report towards "intermarriage," implying that deterrence of such unions was preferred in order to preserve the "white race." *Id.* at 11–12 ("Intermarriage between the Indian and other racial groups has produced a variety of crossed racial types[.] . . . [T]he red men are rapidly approaching total amalgamation with the numerically

29

preponderant white race, except for certain tribes artificially segregated on reservations." (internal quotation marks omitted)).

Suquilanda also observes that two of the members of Congress who had participated in enacting the 1929 Act praised the 1952 Congress for preserving American homogeneity and keeping "undesirables" away from the United States. *See* 98 Cong. Rec. 5773–74 (1952) (statement of Sen. Walter George) (stating that the purpose of the 1952 reenactment was to "preserve something of the homogeneity of the American people" and stating "Mr. President, I hope the time has not come when one must apologize for being a hateful Anglo-Saxon"); *id.* at 4442 (statement of Rep. Thomas Jenkins) (stating that the 1952 debate "has been reminiscent of the days of 20 years ago when the wishes of Members was to keep away from our shores the thousands of undesirables just as it is their wish now"). Suquilanda also shows that fantasies of racial purity were echoed not just by members who served in 1929, but also others who served in 1952. *See id.* at 4314 (statement of Rep. John Travers Wood) ("It seems to me the question of racial origins—though I am not a follower of Hitler—there is something to it.").

Suquilanda contends that this recorded history demonstrates the continuing racial animus behind the 1952 Act, especially given that the 1952 Congress did not

30

repudiate the racist history of the 1929 Act. Thus, he argues that he has met his burden to show that discriminatory purpose had been a motivating factor in the decision to promulgate § 1326 in 1952, and that he has shifted the burden to the government to now attempt to rebut this by demonstrating that the same decision to enact the provision would have resulted had the impermissible purpose not been considered.

While Suquilanda is correct that the legislative history clearly demonstrates discriminatory animus from some members of Congress, and specifically from two members present both in 1929 and 1952, the fact that there were some members of Congress who made racist remarks or held discriminatory beliefs is not necessarily sufficient to cast the intent of Congress as a whole as discriminatory, or even to demonstrate racial animus as to § 1326 in particular. *See United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("It is . . . a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."); *see also Brnovich v. Democratic Nat'l*

*Comm.*, 594 U.S. 647, 688 n.22 (2021) (noting that the views of an earlier legislature are generally not probative of the intent of a later legislature, particularly when the subsequent legislature has "a substantially different composition" (quoting *Democratic Nat'l Committee v. Reagan*, 329 F. Supp. 3d 824, 881 (D. Ariz. 2018))). Yes, racial animus infected the opinions and votes of some members of the 1952 Congress, but the Senate Report and Congressional Record do not demonstrate that it infected a sizeable portion of the 1952 Congress, or that their actions en masse were motivated by racially discriminatory intent, or that there was racial animus specifically infecting the passage of § 1326.

Further, there is a "presumption of legislative good faith [that is] not changed by a finding of past discrimination." *Abbott*, 585 U.S. at 603. The fact that Congress did not repudiate the racially discriminatory motivations behind the 1929 Act when it promulgated the INA in 1952 does not imbue the 1952 Congress with discriminatory intent. But Suquilanda insists that because § 1326 left prior law "largely unaltered," it does not escape the original discriminatory intent with which it was enacted. Appellant's Br. at 38. Even if we accept that argument as true and meaningful, Congress has amended and expanded § 1326 since 1952 without indication of bad faith. If a law that was "known to have been originally

32

enacted with a discriminatory purpose" is then "substantive[ly] amend[ed]," an *Arlington Heights* challenge requires a showing of "discriminatory intent reasonably contemporaneous with" that amendment. *Hayden*, 594 F.3d at 167 (internal quotation marks omitted) (accepting that three prior provisions were enacted with discriminatory intent, but additionally requiring challenger to show that subsequent amendment was also motivated by discriminatory purpose). The post-1952 amendments effected substantive changes to § 1326,[13] and they are not alleged to be tainted by any discriminatory intent contemporaneous with their passage. This only further signals distance from the discriminatory intent evident in the 1929 Act, and renders the argument that the illegal reentry statute was not meaningfully amended between 1929 and 1952 irrelevant to our inquiry.

\* \* \*

---

[13] In 1988, Congress imposed enhanced prison terms for "any" reentry; in 1990, it authorized greater fines; in 1994, it included increases to the maximum prison terms for defendants with prior convictions; and in 1996, it included enhanced penalties, created requirements for a collateral attack of a deportation order, and expanded its coverage. *See* Federal Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7345, 102 Stat. 4471 (1988); Immigration Act of 1990, Pub. L. No. 101-649, § 543, 104 Stat. 5059 (1990); Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 130001(b), 108 Stat. 2023 (1994); Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, §§ 507(c), 438(b), 441(a), 110 Stat. 1267, 1276, 1279 (1996); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, §§ 305(b), 308(d)(4)(J), 308(e)(1)(K), 308(e)(14)(A), 324, 110 Stat. 3009, 3009-606 to 607, 3009-618 to 20, 3009-629 (1996).

We understand that it is meaningful and ideal for Congress to address a law's "tawdry past" when reenacting it in order to clearly signal the repudiation of racial animus and taint. *See Ramos v. Louisiana*, 590 U.S. 83, 115 (2020) (Sotomayor, J., concurring in part). But that is not the required standard under current Supreme Court jurisprudence. *See, e.g., Abbott*, 585 U.S. at 605–614 (explaining that the district court was incorrect to require the reenacting legislature to repudiate past discrimination in the history of a statute). As such, Suquilanda has failed to shift the burden to the government under *Arlington Heights* because the legislative history presented does not demonstrate that racial discrimination was a "substantial" or "motivating" factor behind enactment of the 1952 Act. *Hunter*, 471 U.S. at 228 (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 287). Therefore, we join six of our sister courts in concluding that § 1326 does not violate the Fifth Amendment.[14]

### III.   CONCLUSION

The judgment of the United States District Court for the Southern District of New York is **AFFIRMED**.

---

[14] *See United States v. Viveros-Chavez*, No. 22-3285, 2024 WL 3819304, at *9 (7th Cir. Aug. 15, 2024); *Amador-Bonilla*, 102 F.4th at 1113; *Sanchez-Garcia*, 98 F.4th at 94; *United States v. Wence*, No. 22-2618, 2023 WL 5739844, at *3 (3d Cir. Sept. 6, 2023); *Carrillo-Lopez*, 68 F.4th at 1153–54; *Barcenas-Rumualdo*, 53 F.4th at 863–67.